**In the Matter of CITY STORES COMPANY et al., Debtors.**

**Bankruptcy Nos. 79 B 1320, 79 B 1323.**

United States Bankruptcy Court,
S. D. New York.

Feb. 26, 1981.

**718**

Golenbock & Barell, Levin & Weintraub, New York City, for debtors.

· Edward J. Schwarz, New York City, for The Mall, Inc., and Marx Realty & Improvement Co., Inc.

## DECISION ON APPLICATION TO ASSIGN HUNTSVILLE MALL LEASE

EDWARD J. RYAN, Bankruptcy Judge.

On July 27, 1979, City Stores Company ("City Stores") and a number of its subsidiaries filed petitions in proceedings for an arrangement under Chapter XI, § 322, of the Bankruptcy Act, and Rule 11–6 of the Rules of Bankruptcy Procedure and, thereafter, each was continued in the operation and management of its business and property. The instant proceeding, seeking an order pursuant to Section 70(b) of the Bankruptcy Act,[1] was commenced by petition dated August 5, 1980.

The matter came on for preliminary hearing on August 12, 1980 and August 14, 1980; the issues raised by the application were tried on September 15, 16, 17, 18, 25,

October 29 and November 24, 1980. A judgment containing, inter alia, ultimate findings, dated January 21, 1981, was entered by this court approving the assignment of the existing City Stores lease to Hills Department Stores ("Hills"), a "conventional department store", provided that Hills take the assignment without the modifications originally requested. The following serves to amplify the court's January 21, 1981 judgment and findings.

City Stores is the lessee and Loveman's Department Store ("Loveman's"), a division of City Stores, is the tenant of premises located in a shopping mall in Huntsville, Alabama (the "Mall") under a lease, dated November 1, 1963, as amended, with Levine Huntsville Development Corporation ("LHDC"), as landlord (the "lease"). The Mall, Inc. purchased the premises from LHDC in 1964 and assumed all of LHDC's rights and liabilities. Marx Realty & Improvement Co., Inc. ("Marx Realty") manages the premises under an agreement with The Mall, Inc. (The Mall, Inc. and Marx Realty are collectively referred to as the "landlord".). City Stores' leasehold runs until 1991 with several additional option periods as provided for in paragraph 6(a) and (b) of the lease.

By letter dated June 18, 1980, Hills offered to pay City Stores $600,000 for the conditional assumption of its leasehold at the Mall.

Section 21(a)(2) of the lease provides, in pertinent part, that:

"(a) Tenant may, at any time after it takes possession of leased premises:

(2) Assign this Lease to its parent, to a subsidiary or a company under common control (as above defined), or to any other corporation organized under the laws of any state of the United States, provided that such assignee is or will, after such

---

1. 11 U.S.C. § 110(b)

"The trustee shall assume or reject an executory contract, including an unexpired lease of real property, within sixty days after the adjudication or within thirty days after the qualification of the trustee, whichever is later, but the court may for cause shown extend or reduce the time. . . . A trustee who elects to assume a

contract or lease of the bankrupt and who subsequently, with the approval of the court and upon such terms and conditions as the court may fix after hearing upon notice to the other party to the contract or lease, assigns the contract or lease to a third person, is not liable for breaches occurring .after the assignment."

assignment, be engaged in the conventional department store business (not discount store) and have a net worth of not less than Thirty Million ($30,000,000.00) Dollars. In the event of any such assignment, Tenant shall be relieved of all obligations hereunder, provided such assignee shall assume in writing all of Tenant's obligations hereunder."

City Stores' August 5, 1980 petition seeking court approval of its lease assignment to Hills raised three distinct issues which, for the sake of clarity and expedience, were tried separately. The first issue determined was whether Hills satisfied the criteria of Section 21(a)(2) of the lease in question, specifically, whether Hills is a "conventional department store (not discount store)" having a net worth in excess of $30,000,000. This issue was tried first because if it were determined that Hills was not a conventional department store or that Hills lacked the requisite net worth, then the proposed assignment would have violated the terms of the lease and, without the need to proceed any further, this court would not have approved the assignment.

The second issue tried was whether the landlord waived any alleged violations by City Stores of either Section 13(b) of the lease or the requirement to pay percentage rent.

The final issue tried concerned the reasonableness (or lack thereof) of the landlord's refusal to consent to the closing off of two entrances on the premises and the building of a mezzanine therein.

The first issue litigated concerned the meaning of paragraph 21 of the lease, specifically the distinction between the terms "conventional department store" and "discount store." City Stores argued that Hills is a "conventional department store" with a sufficient net worth to satisfy the provisions of the lease.[2] The landlord, however, asserted that Hills was not a "conventional department store" but rather a "discount store" such as is prohibited under the terms of the lease. To decide this issue, it was necessary to determine what the parties who drafted this lease intended in 1963 by the words "conventional department store (not discount store)".[3] Testimony was taken from Mr. Irving Zipin, City Stores' then house counsel who negotiated the lease on behalf of City Stores,[4] and Mr. Lawrence Levine, the original developer of The Mall.

The testimony showed that, although City Stores began the negotiations without the intention of including a sublet and assignment clause, such a clause was inserted as Section 21 of the lease at the insistence of the landlord. The original sublet and assignment clause proposed was one that had been drafted by Mr. Zipin approximately eight years prior to the lease negotiations, as a boiler plate clause for use in those situations where a sublet and assignment clause was necessary.[5] The landlord attempted to further limit the tenant's right of assignment by requiring any proposed assignee to be a store of the same quality and image as Loveman's. However, Mr. Zipin categorically refused to consider limiting language that would restrict assignment to a "Loveman's-type" of operation. Unable to obtain City Stores' agreement to the limiting terms, Mr. Levine proposed inserting the word "conventional" before the words "department store" in Section 21(a)(2) of the draft, followed by the words "not discount store" in parentheses. During the course of his testimony, Mr. Levine conceded that he was attempting to obtain that which Mr. Zipin had previously refused, namely a store of the quality and image of Loveman's. However, Mr. Levine testified that he never disclosed this intention to Mr. Zipin and, furthermore, that there were no discussions between Zipin and Levine at that time regarding the

---

2. Hills is a division of SCOA Industries, Inc. ("SCOA"). At the end of January, 1980, SCOA had a net worth well in excess of the lease provision's requisite $30,000,000.

3. Negotiation of the lease began in 1963.

4. Mr. Zipin retired from City Stores in August of 1978 and has been working for the landlord as its counsel since that time.

5. SM 9/16/80 pp. 264 et seq.

meaning of Levine's proposed phrase "conventional department store (not discount store)".

The term "conventional department store (not discount store)" is not so clear as to preclude receipt of clarifying evidence. This court will not impute Mr. Levine's unexpressed intentions into the lease. Although Mr. Levine wanted a guarantee that a "Loveman's-type" operation would occupy the premises, Mr. Zipin clearly refused this request and the term "conventional department store (not discount store)" cannot be interpreted to satisfy Levine's request.

The words "conventional" and "department store" are defined, respectively, in Webster's Dictionary [6] as follows:

"conventional ... 2a: according with or based on convention b: Trite, Commonplace", at p. 182.

"department store n: a store keeping a wide variety of goods arranged in several departments", at p. 221.

We are aware that a dictionary definition, though alone insufficient, provides at least a starting point in the inquiry.[7]

The term "discount store" has an even less precise meaning than the phrase "conventional department store". As with the words "conventional department store", the parties did not indicate what the words "discount store" were to mean in the context of the lease. Mr. Zipin did testify, however, that during the lease negotiations, Korvettes Department Store was "mentioned" in connection with the words "not discount store" in Section 21(a)(2) of the lease.

Using the term "discount store" in connection with Korvettes can evoke the "door-busting", large advertising campaigns, and selling of nationally advertised brands at lower than their suggested retail prices characteristic of Korvettes at its inception. However, as testified to by Mr. William Wilensky, the former president of Korvettes, the term "discount store" did not refer to the scope of services provided by a particular store, the manner of fixturing a store, or the income level of the store's customers. By 1963, the meaning of the term "discount store" was blurred by the fact that major department stores, such as Macys, Gimbels and Abraham & Straus had started to meet Korvettes' competition and were selling appliances on a discount basis and advertising in a manner similar to that of Korvettes', while Korvettes and other "door busting" discount stores had begun trading-up to the level of the conventional department stores.[8]

The evidence [9] demonstrates that Hills satisfies the lease's criteria for a "conventional department store (not discount store)". Hills is an institutional retailer which carries a wide range of soft and hard lines. Hills characterizes itself as the "anti-inflation department store." It does not discount any dollar amount or percentage from a manufacturer's suggested retail price; rather, Hills prices goods from its mark-up chart regardless of whether or not the goods have a suggested retail price. Hills stores have approximately ninety-three departments, a portion of which are serviced departments. Its targeted customer is the middle income family shopper, which Hills defines as a customer with a family income of approximately $20,000 to $25,000. In general, Hills regards such other conventional department stores as Sears, J. C. Penney and Montgomery Ward as its major competitors.

The rule of strict construction, *contra proferentem*, requires that a contract be

**6.** *Webster's Seventh New Collegiate Dictionary* (based on Webster's Third New International Dictionary) G. & C. Merriam Co. (Springfield, Mass. 1963).

**7.** *Mitsui & Co., Ltd. and Ataka Co., Ltd. v. American Export Lines, Inc.* (2d Cir. 1981), 636 F.2d 807, at 814.

**8.** SM 9/15/80, pp. 51–68.

**9.** See, e. g., SM 9/16/80, pp. 109–110; 135–140; 150.

construed against the person preparing the terms thereof.[10]

Construing the term "conventional department store (not discount store)" against the party who proposed the words and giving that term its meaning as of 1963 when the lease was drafted and, considering the present-day characteristics of Hills Department Stores results in a finding that Hills is a "conventional department store" and is not a "discount store" within the meaning of Section 21(a)(2) of the lease.

I find that "conventional department store", as used in the lease, means any store that carries several lines of merchandise, that is organized into separate departments and that comports with traditional usages. "[N]ot discount store", as understood in 1963, meant any "non-doorbusting" Korvettes-at-its-inception type store. Thus, an assignment by City Stores to Hills, absent other considerations, is not violative of the lease provisions and fully comports with Section 21(a)(2) thereof.

The second issue litigated concerned the status of the lease; specifically, whether the landlord waived any alleged defaults by the tenant under the lease. The landlord alleged that it had effectively terminated City Stores' lease as of July 30, 1980 with its notice, dated July 17, 1980, claiming that two prior "defaults" by City Stores had not been cured. The "defaults" to which the July 17 notice referred were, respectively:

1. An alleged violation of Section 13(b) of the lease [11] caused by the termination of operations and the vacatur of the premises,[12] and

2. An alleged failure to pay $20,431.16 in percentage rent.

■ The $20,431.16 allegedly due in percentage rent is the subject of a bona fide dispute between the parties concerning the proper allocation of said rental monies. City Stores' good faith belief that payment of the remaining percentage rent would violate direct orders of this court can not be the predicate for termination. If the monies are rightfully due and owing at this time, City Stores is entitled to cure that default.[12a]

■ Furthermore, the landlord is estopped from asserting the right to terminate because it waived the tenant's other alleged default. Subsequent to the April 5, 1980 closing and liquidation sale, the landlord accepted rent from the tenant. The landlord accepted rent for the months of April, May and June prior to sending out its first default notice, with full knowledge that the store had closed and was being fully liquidated. The landlord continued to

---

**10.** See, *Mutual Life Insurance Co. v. Hurni Packing Co.*, 263 U.S. 167, 174, 44 S.Ct. 90, 68 L.Ed. 235 (1923); *Rentways, Inc. v. O'Neil Milk & Cream Co., Inc.*, 308 N.Y. 342, 348, 126 N.E.2d 271 (1955).

**11.** Section 13(b) of the lease provides:

"(b) Except as otherwise provided in this Lease, Tenant will occupy the entire leased premises promptly upon commencement of the term of this Lease and thereafter shall continuously and actively use and occupy at least Sixty Thousand (60,000) square feet thereof (which includes perimeter stock areas) for the sale of its merchandise and services thereon and, further, shall keep open for business to the public during normal business hours, Monday through Saturday, (except state, national and religious holidays), and shall keep the leased premises properly staffed and stocked with merchandise for the purposes of its business hereunder, throughout the term of this Lease and any extensions thereof, so long as it is legal to use such premises for such purposes, subject to acts of God, governmental restrictions, temporary interruptions arising from labor disputes, strikes, periods of setting up and dismantling, fire or other casualty, civil riots or disturbances which, in Tenant's sole opinion, make it necessary to close the business temporarily to protect lives and property, and closings on account of reasonable special occasions or causes beyond Tenant's control, provided that Tenant shall limit such closings to no more than three (3) business days, except in case of emergencies beyond Tenant's control."

**12.** The termination of operations and the vacatur of the premises allegedly occurred on April 5, 1980, when City Stores closed its Loveman's Store to take inventory then reopened the store several days later, pursuant to court order, to conduct a liquidation sale.

**12a.** See, *e. g., Weaver v. Hutson*, 459 F.2d 741 (4th Cir. 1972), *cert. den.* 409 U.S. 957, 93 S.Ct. 288, 34 L.Ed.2d 227 (1972).

accept monies after the mailing of the June 6 notice (i. e., percentage rent tendered in June and rent for the month of July).

Not only did the landlord accept rent, but also, with full knowledge of the events, the landlord sat back and voiced no objections or intentions, either to City Stores or this court, that the court-ordered liquidation and resultant termination of operations would be considered by it to be a default under the lease. The landlord was fully aware of the April 5, 1980 closing and complete liquidation sale but took no steps to place City Stores in "default" at that time. Two days prior to the April 5, 1980 closing, Mr. Leonard Marx, president of Marx Realty and of the Mall, Inc., was told by Mr. Jack Farber, Chairman of the Board of City Stores, that the Loveman's store was closing and that City Stores wanted to convey its lease no later than July 31, 1980. Messrs. Farber and Marx then agreed to work together to get a tenant who was compatible with the lease requirements and to try to get for City Stores the maximum amount of money while getting the landlord a proper tenant.

Mr. Marx testified that when he telephoned Mr. Farber on April 7, 1980, Mr. Farber told Marx that Loveman's was being closed in accordance with a court order for the purpose of taking inventory. The liquidation sale, which was conducted on the Loveman's premises, lasted four to five weeks and was well publicized. Mr. Marx acknowledged that he learned of the April 5, 1980 closing and commencement of the liquidation sale prior to Monday, April 7, 1980 from an officer of Marx Realty, Mr.

Jacques Blinbaum, who was on the premises at the time that the "going out of business sale" was being conducted and was charged with the responsibility for the Mall. Indeed, Mr. Marx lulled Mr. Farber into inaction when the former told Mr. Farber "not to worry" about the June 6, 1980 default notice.

The consequence of these actions and forbearances is that the landlord has waived its objections, pursuant to Section 13(b) of the lease, to the April 5, 1980 closing and subsequent "going out of business" sale. Since the landlord waived the tenant's default by accepting rent and sitting back without objecting to the irreversible [13] liquidation of the Loveman's operation, the landlord is estopped from asserting the default; therefore, the otherwise valid lease remains in full force and effect.

The final issue litigated concerned the reasonableness of the landlord's refusal to consent to Hills' proposal to close off two entrances on the premises and to erect a mezzanine within the premises, where both the proposed alteration and closing were to be done in conformity with local law. In effect, City Stores, bearing the burden of proof, requested that this court give a declaratory judgment to the effect that if the landlord refused to consent to the alterations intended by the proposed assignee, then such refusal would be unreasonable and violative of Section 12(a) of the lease.[14]

The landlord argued, in the first instance, that its written approval was required because the proposed alterations would affect both the structure and facade of the build-

13. The liquidation sale was conducted on the Loveman's premises by an outside liquidator. As a "going out of business" sale, the indicia of an irreversible liquidation were evident in that the store: (a) was not stocked with merchandise, much less fully stocked, in violation of Section 13(b); (b) did not restock any merchandise, impliedly in violation of Section 13(b); (c) was not staying in business; (d) was closed at the beginning of April 1980 in excess of the three-day period specified in paragraph 13(b); and (e) after the liquidation sale was completed, it was obviously too late for City Stores to go back into business or cure any alleged default.

14. Section 12(a) of the lease provides, in pertinent part:

"Tenant may, from time to time, make any alterations, additions or improvements to the building and improvements forming a part of the leased premises but only within the interior limits of the leased premises, .... Any alterations, additions or improvements to the structure or facade of the building shall require the written consent of Landlord, which consent shall not be unreasonably withheld ...."

ing. Although some evidence was presented on this issue, no decision need be reached concerning the structural effects of the proposed alterations since, in other respects, City Stores failed to meet its burden of proving that the landlord's withholding of consent would be unreasonable.

On the matter of the closing off of the two entrances, the court (prescinding from the question whether the tenant is precluded from litigating the issue because it has not yet formally sought the landlord's consent) finds that the landlord would not be acting unreasonably if it were to withhold its consent. The landlord demonstrated that the proposed closing of the south and west entrances of the premises would be unacceptable because such action would interfere with the flow of customer traffic to the premises as well as to the satellite stores and, the closing would interfere with the entire parking scheme by creating a dead-space parking area.

City Stores failed to carry its burden of proof concerning the matter of the unreasonableness of withholding consent to the erection of a mezzanine. City Stores failed, in the first instance, to demonstrate that any firm proposition was ever made to the landlord with respect to the mezzanine. It is not unreasonable for the landlord to refuse to consent to an inconcrete proposal. It is therefore premature for this court to determine whether the landlord's refusal to a more detailed plan would be unreasonable because the landlord has not yet refused such consent.

In summary, City Stores has failed to establish that it would be unreasonable for the landlord to refuse to close off two entrances; on the contrary, this court finds that such refusal would be most reasonable. Similarly, City Stores has failed to offer sufficient proof to establish that the landlord has unreasonably refused to consent to the erection of a mezzanine since, inter alia, no plans for a mezzanine were ever presented to the landlord.

The ultimate findings of fact and conclusions of law are contained in this court's judgment dated January 21, 1981. The court approves the assignment of the existing City Stores lease to Hills Department Stores, a "conventional department store (not discount store)", provided that Hills take the assignment without the modifications originally requested.

It is so ordered.