In re EVELYN BYRNES, INC., Debtor.

Bankruptcy No. 83 B 10433.

United States Bankruptcy Court, S.D. New York.

Aug. 30, 1983.

---

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for debtor; Warren R. Graham, New York City, of counsel.

Albert Togut, New York City, for the Creditors' Committee.

Steven W. Stutman, New York City, for Landlord, Park 58 Corp.

Simon, Uncyk & Borenkind, New York City, for Proposed Assignee, Park Avenue Fashions; Alan Borenkind, New York City, of counsel.

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

The debtor, Evelyn Byrnes, Inc. seeks the permission of this Court, pursuant to § 365 of the Bankruptcy Code, 11 U.S.C. § 365 (1978) (the "Code"), to assume and assign its unexpired lease of a store.

## I

In April 1980, Evelyn Byrnes, Inc. entered into a lease agreement with Park 58 Corporation ("Park 58") whereby it leased the corner store in the building known as 470 Park Avenue in New York City, located on the corner of Park Avenue and 58th Street. The lease had a ten year term. In addition to setting forth the annual rent and containing the usual covenants to a store lease, the lease, in a rider prepared by Park 58,[1] contained a use clause providing that:

Tenant shall use and occupy the demised premises for the sale of fine women's clothing and related accessories and for no other purpose. Tenant shall at all times conduct its business in a high grade and reputable manner and shall keep show windows and signs in a neat and reputable condition.

The lease further prohibited the affixing of any exterior signs to the building without the approval of the landlord and required the landlord's consent to alteration of the interior of the premises. It contained the further covenant that

Tenant affirmatively represents that it understands and is aware of the high caliber of Landlord's building and Tenant agrees and guarantees that it will main-tain the premises in a manner consistent with the high standards of the building and all of its alterations and exterior and interior decorations and furnishings will comply therewith.

The debtor filed a petition for reorganization under Chapter 11 of the Code on March 22, 1983. On July 26, 1983, the debtor, pursuant to a prior order of this Court, conducted an auction sale of the leasehold. At the auction, Park Apparels Fashions Ltd., an affiliate of Labels For Less Inc. (jointly referred to as "Labels For Less"), submitted the high bid of $250,000, which bid was accepted subject to the approval, if any, of this Court.

Upon notice, a trial was held on the debtor's motion to assume the lease and assign it to Labels For Less. Testimony of a representative of Labels For Less and of a representative of the managing agent for 470 Park Avenue were taken and exhibits were submitted. The evidence revealed the following facts.

Labels For Less currently owns eight stores, all of which sell better and designer women's sportswear and dresses as are sold in well-known department stores such as Saks Fifth Avenue, B. Altman & Co., and Bloomingdale's.[2] This is apparently "fine women's clothing and related accessories" for there appears to be no genuine dispute that the use clause of the lease will be complied with if the assignment to Labels For Less is approved.[3]

Park 58, moreover, does not contend, were the lease to be assigned to Labels for Less, that it would lack adequate assurance of future performance in regard to the financial obligations of the lease. Labels For Less has, at Bankers Trust Company, a general unsecured credit line in the amount of $500,000 and an additional credit line for the store it would open at 470 Park Avenue, if the assignment of the lease is approved, in the amount of $350,000. It intends to spend $250,000 to obtain the lease and

1. Record of evidentiary hearing ("R.") 37.

2. R. 15.

3. R. 31.

$100,000 for alteration of the store and plans to stock the store initially with $150,-000 retail value of inventory.[4]

In addition, all the Labels For Less stores have been profitable; none has been closed. For the fiscal year ended May 31, 1983, Labels For Less had annual total sales, net of sales tax and commissions of approximately $6,167,000, broken down by store location as follows:

| Rockefeller Center | $1,013,000 |
|---|---|
| 99 Park Avenue | 607,000 |
| 130 E. 34th Street | 910,000 |
| 800 Third Avenue | 1,126,000 |
| 65th Street and Third Avenue | 525,000 |
| 639 Third Avenue | 761,000 |
| Lincoln Towers Complex | 451,000 |
| 70th Street and First Avenue | 774,000 [5] |

This success is apparently due to the Labels For Less practice of selling at discount women's clothing identical to or of the same quality as that sold at finer department stores in stores appointed to attract customers who might also shop at such department stores. In at least one store, those appointments include overhead track lighting, chrome fixtures and clothing racks and carpeting.[6]

It is this practice, however, that is of concern to Park 58. While it concedes that Labels For Less is a "very good operation,"[7] Park 58, according to its witness, sought in leasing the store to Evelyn Byrnes, Inc., a "salon" having an interior decorated much in the manner of a living room in an apartment or home. To Park 58, track lighting and chrome fixtures and racks are simply not "elegant" and therefore are unsuitable for its building. It notes, moreover, that the immediate neighborhood on Park Avenue consists of speciality shops. It urges that the appearance of Labels For Less is incompatible with the building.[8]

Examination of the lease, however, reveals that the term "salon" is nowhere in-cluded as a term of limitation in describing the use or decoration of the store and nowhere is a discount operation expressly prohibited.

## II

From these facts arises the issue of whether Park 58 has or will receive adequate assurance of future performance of the unexpired lease as required by §§ 365(b)(1) and 365(f)(1) for the debtor to assume and assign the Lease. Since the assurance tendered by the debtor upon the assumption of the lease is the prospective performance of the assignee Labels For Less under § 365(f)(1), we turn to that section. It provides:

(f)(1) Except as provided in subsection (c) of this section notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts or conditions the assignment of such contract of lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this subsection; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

There being no dispute that the debtor is able to assume the lease subject to all the restrictions imposed by the Code, our attention is directed to whether adequate assurance of future performance has been provided to the landlord.

"The terms 'adequate assurance' of future performance are not words of art; the legislative history of the Code shows

---

**4.** R. 12–13.

**5.** R. 10–11, 14.

**6.** R. 15, 20, 22, 30.

**7.** R. 29.

**8.** R. 25–26.

that they were intended to be given a practical, pragmatic construction." *In re Sapolin Paints, Inc.,* 5 B.R. 412, 6 B.C.D. 776, 781, 2 C.B.C.2d 854, 864 (Bkrtcy.E.D.N.Y. 1980)  As such, its primary focus centers on the assignee's ability to satisfy the financial obligations imposed by the lease. *In re Brentano's, Inc.,* 29 B.R. 881, 883, 10 B.C.D. 717, 718, 8 C.B.C.2d 566, 569 (Bkrtcy.S.D.N.Y.1983); *In re U.L. Radio Corp.,* 19 B.R. 537, 542, 8 B.C.D. 1273, 1275, 6 C.B.C.2d 430, 436 (Bkrtcy.S.D.N.Y.1982); *In re Lafayette Radio Electronics Corp.,* 9 B.R. 993, 998, 4 C.B.C.2d 220, 227 (Bkrtcy.E.D.N.Y.1981). Since the landlord, at the hearing on this proceeding, essentially conceded that the assignee's financial status is not in issue, we, therefore, consider the other, less significant, concepts embodied in this phrase.

These additional concepts, including, *inter alia,* tenant mix and balance and the exclusivity provisions of other leases in the same project, are neither defined nor mandated by the Code, except with regard to leases of real property in shopping centers.  The legislative history of § 365, as carefully reviewed by Judge John J. Galgay of the United States Bankruptcy Court for the Southern District of New York in *In re U.L. Radio Corp., supra,* shows, however, that Congress equated "adequate assurance" with that which will give the landlord the full benefit of his bargain.  19 B.R. at 541, 543,[9] 8 B.C.D. at 1275, 6 C.B.C.2d at 435.

But, it is equally clear that in so doing, Congress did not mandate that the courts require the assignee to literally comply with each and every term of the lease.  19 B.R. at 544, 8 B.C.D. at 1276, 6 C.B.C.2d at 438. It has entrusted to the courts the determination, on a case-by-case basis, of the meaning of the term "adequate assurance", taking into account whether the landlord's opposition to the assignment is "based upon reason and ... [is] not ... arbitrary or capricious."  19 B.R. at 542; *In re Sapolin Paints, Inc.,* 5 B.R. 412, 421, 6 B.C.D. 776, 2

C.B.C.2d 854 (Bkrtcy.E.D.N.Y.1980); *accord In re U.L. Radio, Corp., supra,* 19 B.R. at 542, 8 B.C.D. at 1275, 6 C.B.C.2d at 436. Such a determination is, nevertheless, to be made in the light of Congress' express policy of favoring assumption and assignment as a means of continuing performance and realizing value and thereby assisting the debtor in its rehabilitation or liquidation. Accordingly,

> To prevent an assignment of an unexpired lease by demanding strict enforcement of a use clause and thereby contradict clear Congressional policy, a landlord or lessor must show that actual and substantial detriment would be incurred by him if the deviation in use was permitted.

*In re U.L. Radio Corp., supra,* 19 B.R. at 544.

Thus in *In re Peterson's Ltd. Inc.,* 31 B.R. 524, (Bkrtcy.S.D.N.Y.1983), the court approved the assignment by the debtor, a pipe and tobacco store, of its lease to a cigar shop that sold high quality goods at discount, to dignified customers a là Labels For Less.  It held that, in view of the similar nature of the businesses, the intended use of the premises by the cigar store would not violate the "high class" "no cut rate shop" terms of the lease's use clause and that adequate assurance had been given.

More radical was the result reached in *In re U.L. Radio Corp., supra.*  There, the debtor sought to assign to a bistro a lease providing "that the lessee shall use the premises only for television service and sale of electrical appliances."  19 B.R. at 539, 8 B.C.D. at 1273, 6 C.B.C.2d at 431–32.  Rejecting the landlord's argument that the proposed assignment, due to the violation of the use clause, would unlawfully modify the lease, this Court approved the assignment. In so doing, Judge Galgay noted that the landlord failed to adduce evidence demonstrating the actual and substantial detriment he would incur if the court approved the assignment.  Second, he found that the

---

9. *See, also,* H.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977) *reprinted in* 1978 *U.S.Code Cong. and Ad.News* 5787, 5963, 6304–6305;

S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978) *reprinted in* 1978 *U.S.Code Cong. and Ad.News* 5787, 5845.

contemplated use would have no adverse affect on the other tenants in the building. These factors plus the general Congressional policy favoring assignment, led the Court to conclude that the landlord would receive the full benefit of its bargain under the assignment, thus satisfying the statutory requirements of § 365(f). 19 B.R. at 545, 8 B.C.D. at 1277, 2 C.B.C.2d at 439. *See, also, In re Sapolin Paints, Inc.,* 5 B.R. 412, 420–21, 6 B.C.D. 776, 781, 2 C.B.C.2d 854, 864 (Bkrtcy.E.D.N.Y.1980).

■ These cases should not be interpreted to mean that a use or similar clause is meaningless or that the court's power is unlimited. In the application of the equity contemplated by the Code to each individual case, moderation is all. The outer bounds would obviously be crossed were a debtor to seek to assign to a massage parlor a lease prohibiting use detrimental to the building, as hypothesized by Judge Parente. *In re Lafayette Radio Electronics Corp.,* 9 B.R. 993, 1002, 4 C.B.C.2d 220, 231–32 (Bkrtcy.E.D.N.Y.1981). Short of that, the courts look to the practical prejudice suffered by the landlord.

In *Lafayette Radio,* an assignment similar to the "elegance" and "high standards" concerns advanced by Park 58 was considered. The debtor sought to assign the lease or sublet the premises also to Labels For Less. The landlord argued that the assignee's mode of operation affected the building's "dignity" in express violation of the lease's use clause. The court held that use of clothing racks and painting the ceiling a dark color at two other "Labels For Less" stores was insufficient evidence to support the landlord's contentions and permitted the assignment. 9 B.R. at 1002, 1004, 4 C.B.C.2d at 232.

Not to the contrary is the actual holding of *In re Pin Oaks Apartments,* 7 B.R. 364, 6 B.C.D. 1396 (Bkrtcy.S.D.Tex.1980) relied upon by Park 58. There, the court held that the lease terms prohibiting subleasing prevented the trustee from assuming and subleasing the debtor's leasehold where the landlord would receive less rent than provided in the lease. Such a change directly puts in issue the principal concern of adequate protection.

The reasoning employed by the court in *Pin Oaks* in reaching that result, however, is far narrower than that contemplated by the Code. The court stated that if the landlord were to receive adequate assurance of future performance, the anti-sublease provisions of a lease could not be modified:

If Congress intended to give this Court or the trustee the power to abrogate any contractual rights between a debtor and non-debtor contracting party other than anti-assignment and "ipso-facto" [i.e., bankruptcy] clauses, it would have expressly done so.

7 B.R. at 367, 6 B.C.D. at 1398.

In addition to the concerns expressed in subsequent cases, this reasoning takes no account of the shopping center exception codified in § 365(b)(3). Congress there decreed that adequate assurance must be provided upon assumption of a shopping center lease that a lease's location, use, or exclusivity provisions, *inter alia,* will not be breached "substantially" nor will any tenant mix or balance be disrupted "substantially". The express adoption of these concepts by Congress only with respect to shopping centers strongly indicates that Congress desired greater flexibility in the assumption and assignment of other leases. *See, In re U.L. Radio Corp.,* 19 B.R. at 543–44, 8 B.C.D. at 1276, 6 C.B.C.2d at 437–38 and authorities cited therein. To be sure, such facts are not irrelevant to a § 365(f) determination of adequate assurance but they are given their appropriate weight in an examination of whether a landlord will incur a substantial detriment were the assignment permitted.

### III

No such detriment has been shown here for two principal reasons: the lack of actual harm to the landlord and it being clear that under state law the use intended by Labels For Less would not violate the lease.

## A

■ Park 58's claim that Labels For Less, as a discount operation would not be elegant enough for its building or for the surrounding area is insufficient in law. Lack of elegance simply is not the type of harm envisioned by Congress. Had the landlord desired a "salon" it could have said so in the lease and demonstrated the harm incurred by not continuing to have a salon arrangement in the store. The failure to do so shows that Park 58's displeasure at the prospect of having Labels For Less as a tenant is arbitrary and capricious. *In re Sapolin Paints, Inc., supra.*

Park 58's claims that the value of the cooperative shares issued by Park 58 would decrease and that the value of its building would diminish are the type of harm contemplated. The claims here, however, are unsubstantiated by any evidence. Furthermore, they are rebutted by the protection afforded Park 58 by the alterations clause contained in the lease. Park 58 does not seriously dispute that Labels For Less will sell fine women's clothing and related accessories. It does seriously contend that the intended use by Labels For Less will violate the "high caliber" and "high standards" clauses noted above. There being no substantial detriment to Park 58 from that intended use, however, the contention is not tenable.

## B

Moreover, as a matter of state law, little, if any, significance can be attached to those clauses. Under state law, here the law of New York, the intended use by Labels For Less would not breach the lease.

■ To determine whether confirmation of the assignment of this lease to Labels For Less would result in a violation of the lease provisions, we turn to the lease itself, for "[t]here is no surer way to find out what the parties meant, than to see what they have done." *Brooklyn Insurance Co. v. Dutcher,* 95 U.S. 269, 273, 24 L.Ed. 410 (1877). A fundamental maxim of contract construction is that a contract must be construed according to the expressed intent of the parties. *Frank B. Hall & Co. v. Orient Overseas Associates,* 65 A.D.2d 424, 411 N.Y.S.2d 233 aff'd 48 N.Y.2d 958, 425 N.Y.S.2d 66, 401 N.E.2d 189 (1978). That intention is usually found in the language of the lease. *See Reed v. Knollwood Park Cemetery, Inc.,* 441 F.Supp. 1144 (E.D.N.Y. 1977); *Raleigh Associates v. Henry,* 302 N.Y. 467, 473, 99 N.E.2d 289, 291 (1951). At common law, the unexpressed subjective intent of the parties was deemed to be irrelevant to the interpretation of a contract; except in cases of ambiguity and mistake, the objective intent manifested by the contracting parties controlled. *E.g., Hotchkiss v. National Bank of New York,* 200 F. 287 (S.D.N.Y.1911). As Judge Learned Hand stated:

> A contract has, strictly speaking, nothing to do with the personal, or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party when he used the words intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake or something else of the sort.

*Id.,* 200 F. at 293. *See, also,* Restatement (First) of Contracts § 227 (1932). While the rule substantially limiting the interpretation of contracts to the parties' objective intent has been modified, *see e.g.,* Restatement (Second) of Contracts §§ 201 Reporter's Note, 202, 212 Comments a, b (1981), it remains unchanged with regard to leases in New York. *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 248–49, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975); *Edra Associates v. Deer Park Beauty Corp.,* 91 Misc.2d 896, 398 N.Y.S.2d 841 (D.Ct.Suff.Co.1977). In short, unless an ambiguity is found and proof of the parties' subjective intent is presented, the court will not look beyond the four corners of the lease when attempting to discern its meaning.

While the terms "high caliber" and "high standards" may import certain inferences, they are sufficiently ambiguous to lack the precision necessary to determine whether the use intended by Labels For Less would result in a breach of the lease.[10] Furthermore, although Park 58 vigorously contends that tenancy by a Labels For Less store would not be consonant with the building's "high caliber" and "high standards", nothing in the lease agreement itself indicates that only the "salon-type" operation employed by Evelyn Byrnes would satisfy these criteria.

Consequently, a familiar canon of interpretation emerges. A contractual ambiguity is to be construed against the author and will be interpreted more favorably for the person who had no voice in the selection of the language. *See Mutual Life Insurance Co. v. Hurni Packing Co.,* 263 U.S. 167, 174, 44 S.Ct. 90, 91, 68 L.Ed. 235 (1923); *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 348, 126 N.E.2d 271, 273 (1955); *In re City Stores,* 9 B.R. 717, 720–21 (Bkrtcy.E.D.N.Y.1981); Restatement (Second) of Contracts § 206 (1981). This principle also applies to the construction of leases, at least in New York. *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 248–49, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975).

We, therefore, conclude that the "high caliber" and "high standards" clauses do not preclude a store that sells fine women's apparel as permitted by the use clause, from selling such clothes at discount. We interpret these clauses, as indeed their context indicates, to supplement the alteration clause rather than to refer to pricing policy. In so doing, we note that Park 58's concern for the appearance of its building is adequately protected on this score by the lease provision requiring the landlord's reasona-

ble consent to alterations. We, therefore, hold that the assignment of the leasehold to Labels For Less for use as a discount store selling women's apparel consisting of better and designer women's sportswear and dresses will not be in violation of the express terms of the lease.

It is obvious that if the intended use by the assignee will not violate an unexpired lease, the landlord has received adequate assurance of future performance by the assignee under § 365(f).

Given the assurance of financial performance provided by Labels For Less and the absence of substantial detriment to Park 58, approval of the debtor's assignment of the lease to Labels For Less is mandated by § 365.[11]

The foregoing constitutes this Court's finding of facts and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

Settle Order on Notice. No costs.

---

**10.** No definition of either "high caliber" or "high standards" is found in Webster's Third New International Dictionary (1981). In another context, a roughly equivalent term such as "first class" might not be ambiguous. For example, the term "first class" when used in connection with airline accommodations, has a precise meaning, referring to separate seating arrangements. This is not the case here.

**11.** Park 58 also contends that if Labels For Less is permitted to operate on its premises, it would be a taking of property in violation of the Fifth Amendment. Such contention was rejected in *In re Sapolin Paints, Inc.,* 5 B.R. 412, 6 B.C.D. 776, 2 C.B.C.2d 854 (Bkrtcy.E.D.N.Y. 1980), and has no merit.