**In re FIFTH AVENUE ORIGINALS, Debtor.**

**Bankruptcy No. 82 B 11356.**

United States Bankruptcy Court, S.D. New York.

Sept. 1, 1983.

Paul D. Wexler, John Preefer, New York City, for debtor.

Stroock & Stroock & Lavan, New York City, for landlord, Sherry Netherland Hotel; Lawrence Handelsman and William Lowy, New York City, of counsel.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The debtor, Fifth Avenue Originals, Inc., seeks permission of this Court to assume and assign a lease pursuant to 11 U.S.C. § 365 of the Bankruptcy Code (the "Code").

I

The debtor leases a store in the northeast corner of The Sherry Netherland Hotel located at 783 Fifth Avenue, in Manhattan pursuant to a lease entered into on July 8, 1977 (the "Lease"). The Lease expires on June 30, 1987, subject to a five-year renewal option. Annual rent is $56,000 a year, to be increased by increments of $1,000 per annum.

Two clauses of the Lease are claimed by the parties to be relevant to this proceeding: the use clause states that the debtor shall use the demised premises "as a high-class boutique for the sale of male and female clothing and shoes." A second clause states:

Tenant represents that the sole holder of all the issued and outstanding shares of Tenant is Internaco Investment Corp., a Delaware corporation, (the "Parent") .... Any change of more than ten percent in the beneficial ownership of the holders' interest in Parent listed in Exhibit A shall be deemed an assignment of this lease, which may not be effected without Landlord's prior written consent as provided in Article 11 hereof ... provided that Maurice Amiel shall, at all times, remain the owner of not less than 33⅓% of the issued and outstanding shares of Parent.

The debtor filed a petition for reorganization under Chapter 11 of the Code on July 22, 1982, and is currently operating as a debtor-in-possession. It seeks to assign the Lease to Diane von Furstenberg, a designer of women's and children's clothing, cosmetics and home furnishings. The landlord, Fifth Avenue & 59th Corp., (the "Hotel") objected on two grounds: (i) the intended use by Ms. von Furstenberg would violate the use clause of the Lease and (ii) the Lease is in default because a change in more than ten percent in the beneficial ownership of the Parent has occurred and the default cannot be cured.

At trial, the Hotel conceded that there is no dispute as to Ms. von Furstenberg's ability to comply with the financial provisions or any other provisions of the Lease, other than the use clause. The parties stipulated that rent owed for the past two months will be paid from the proceeds of the assignment. Ms. von Furstenberg produced a financial statement showing a net worth of approximately $16,000,000. She has agreed to deposit $50,000 as security and to pay $400,000 as consideration for the assign-

ment, consisting of a $20,000 down payment, payment of $250,000 on assumption and posting of a bond to assure payment of the remainder.

With respect to the use clause, Ms. von Furstenberg testified that she will use the store as a high-class, luxury boutique for women's clothing and accessories, including cosmetics and fragrances. The revenue from accessories will range up to approximately 20% of sales. She may sell shoes. She will sell perfume, which is marketed under her own label, at prices up to approximately $150 per ounce. Some of the clothing she will carry will be of a unisex design to be worn by men or women. In any case, she intends to sell only prestige items to an exclusive clientele with dresses priced from $150 to $1,500. All of the clothing will be designed exclusively by Ms. von Furstenberg.

Since the inception of the Lease, Fifth Avenue Originals has not limited its inventory to merely men's and women's clothing and shoes. Rather, it has offered for sale "all accessories for the fashion." [1] These included umbrellas, briefcases, luggage, cuff links, tie clips, women's gloves, scarves, hats and veils, "all what is included in the fashion store is what we sold." [2] Not disputing this testimony, the Hotel's manager confirmed it, stating that he had observed several of these items for sale in the store.

Prior to the date on which the petition for reorganization was filed, the store's clothing sales were roughly evenly divided between men's and women's clothing. Since shortly before that date, the store has sold mostly men's clothing. No testimony was offered to the effect that this shift in sales violated the Lease, the Hotel's practice being to act only on the complaint of a customer. No specific complaints were identified, nor did the Hotel's board of directors consider the desirability of Ms. von Furstenberg as a tenant. Notwithstanding its failure to have objected to the shift in the debtor's inventory and the debtors sale of accessories, the Hotel claims that Ms. von

---

1. Elmoznino Deposition, p. 31.

2. Id. pp. 32, 40.

Furstenberg's intentions to operate a women's boutique offering accessories, including expensive clothing and perfume of her own design would violate the use clause of the Lease.

With respect to the alleged change of stock ownership, the corporate books and records of Internaco Investment Inc. ("Internaco"), parent of the debtor, reflect the issuance of 666⅔ shares, apparently of common stock, to each of Prosper Elmoznino, Robert Assor and Maurice Amiel. While four blank certificates are missing, the corporate books and records do not indicate that any of the three certificates issued to Elmoznino, Assor or Amiel have been transferred or surrendered.

There is no dispute regarding the Elmoznino or Assor shares. As to the Amiel shares, the deposition testimony of Ms. Janet Perez, a part-time bookkeeper employed by Internaco, is that in October, 1981, she received a telephone call from the Hotel asking for a current list of the Internaco shareholders. Not knowing their identity, she telephoned Ms. Eichenholtz, (the corporation secretary of Internaco), who informed her that the shareholders were Elmoznino, Assor and Eichenholtz. Perez then telephoned that information to the Hotel and confirmed it by letter.

Ms. Eichenholtz testified that she told Ms. Perez that she would respond to the Hotel upon returning to the office. Ms. Perez, however, at the insistence of the Hotel, went ahead and mistakenly responded, to the best of her knowledge. Ms. Eichenholtz added that Mr. Amiel was and is a shareholder of Internaco and that she was never a shareholder.

Mr. Amiel's deposition testimony is that he continues to own the Internaco stock held by him on the date he signed the Lease, Amiel dep. pp. 15–16,[3] and that a stock certificate pertaining to those shares was issued to him in March 1982. Id. pp.

20, 32–33. He testified further that by early 1981 he had resigned as president of Internaco.

The former secretary-treasurer of the Hotel testified that he met with Amiel in the Fall of 1981 and that Amiel told him that he was no longer a stockholder and would, for a fee, so testify on behalf of the Hotel. He added that the Hotel refused to consider such an arrangement but that it was Amiel's information that led him to call Ms. Perez. After receiving Ms. Perez' letter, the Hotel apparently commenced a state court action involving the purported breach of the stock ownership clause. The result reached there, if any, must have been inconclusive since neither side has included in the record any of the papers relating thereto, except the transcript of Amiel's deposition. Nevertheless, the Hotel, on October 22, 1982, filed in this Court a motion seeking an order compelling the debtor to pay use and occupancy charges for the months of August through October 1982, inter alia. Concurrently, the Hotel filed an objection to a previous application by the debtor to assume and assign the Lease. Notwithstanding its allegation at the hearing on the instant motion of having persistently asserted that the Lease had been terminated due to the purported transfer or dilution of the Amiel shares, nowhere in either the motion or the objection did the Hotel make that claim. Rather, the Hotel merely stated that it had not been reimbursed for expenses in state court litigation that arose "[a]s a result of a default by the Debtor with respect to provisions of the Lease regarding stock ownership of the parent company of the Debtor." Objection of Fifth Avenue & 59th Corporation to Proposed Sale of Lease, paragraph 16 (November 3, 1982). This Court entered an Order on December 1, 1982 granting the Hotel's motion.

3. Amiel testified to owning 66⅔ shares. Amiel deposition at pp. 15, 16. The Hotel has not argued that he, therefore, was not issued the additional 600 shares reflected in the corporate books and records, apparently treating the discrepancy as a typographic error. The Hotel, moreover, does not claim that the discrepancy means that Amiel sold 600 shares. Such a claim would be wholly inconsistent with the deposition transcript use of 66⅔ shares to describe Amiel's holdings at the time the lease was entered into and subsequently.

In a cross-motion filed in response to the debtor's motion to modify the December 1, 1982 Order of this Court, the Hotel similarly failed to claim that the Lease had been so terminated.

The debtor paid the use and occupancy charges sought by the Hotel and ordered by this Court and the Hotel accepted them. Subsequent charges also were paid, apparently belatedly, and accepted. Application for Order Terminating Lease, or in the Alternative Compelling Debtor to Assume or Reject Lease, paragraphs 12–13 (April 13, 1983). Not until it made its application on April 13, 1983, did the Hotel directly assert before this Court that the Lease had been terminated by virtue of Amiel's alleged failure to own a third of Internaco.

### II

■ The ability of a debtor under § 365 of the Bankruptcy Code to assume and assign an unexpired lease is not unlimited. The principal constraints on assumption include the cure, or adequate assurance of the prompt cure, of all defaults, and compensation, or adequate assurance of compensation, for pecuniary loss resulting from the default. Both assumption and assignment are expressly conditioned on the debtor's or the assignee's ability, as the case may be, to furnish adequate assurance of future performance. §§ 365(b)(1), 365(f)(1).

The first issue thus arising is whether, in view of the intended use by Ms. von Furstenberg of the premises, the Hotel has received adequate assurance of future performance of the Lease. We hold adequate assurance was furnished on two alternative grounds: (i) the Hotel will not incur a substantial detriment from the use intended and (ii) the intended use would not violate the Lease under state law, here the law of New York.

The second issue presented is whether the provision of the Lease requiring Mr. Amiel to own one-third of Internaco has been violated, and, if so, whether the Lease is in

default which cannot be cured.[4] We hold that the Hotel has not sustained its burden of proof on that issue or on the issue that its refusal to consent to the assignment triggered by such violation was reasonable. We further hold that the Hotel has waived its claim of default on this ground.

### III

■ Section 365(f)(1) of the Bankruptcy Code provides:

(f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this subsection; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

There being no dispute that the debtor is able to assume the Lease subject to all the restrictions imposed by the Code, we turn to whether "adequate assurance of future performance" has been provided to the Hotel.

That term was intended by Congress to be given a "practical, pragmatic construction," *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420, 6 B.C.D. 776, 781, 2 C.B.C.2d 854, 864 (Bkrtcy.E.D.N.Y.1980), requiring, in the case of an unexpired lease, the landlord to advance cogent reasons, *id.* 5 B.R. at 421, showing that it will incur a substantial detriment were the assignment permitted. *In re Evelyn Byrnes, Inc.*, 32 B.R. 825 (Bkrtcy.S.D.N.Y.1983). As such, its prima-

---

4. Since the proceeds of the assignment will be utilized in part to pay the unpaid rent due for July and August, there is no dispute that the Hotel will receive adequate assurance that the default will be cured.

(Bkrtcy.S.D.N.Y.1983). As such, its primary focus centers on the assignee's ability to satisfy the financial obligations imposed by the lease. *In re Brentano's Inc.,* 29 B.R. 881, 883, 10 B.C.D. 717, 718, 8 C.B.C.2d 566, 569 (Bkrtcy.S.D.N.Y.1983); *In re U.L. Radio Corp.,* 19 B.R. 537, 542, 8 B.C.D. 1273, 1275, 6 C.B.C.2d 430, 436 (Bkrtcy.S.D.N.Y.1982); *In re Lafayette Radio Electronics Corp.,* 9 B.R. 993, 998, 4 C.B.C.2d 220, 227 (Bkrtcy.E.D.N.Y.1981). The Hotel, however, conceded that the assignee's financial status is not in issue, and that its only concern regards the intended use of the premises. Thus, the issue is whether that intended use affords adequate assurance of future performance of the Lease. Put differently, will the Hotel incur a substantial detriment if the assignment is approved?

The line between a landlord's dislike of the proposed assignee and detriment is shown by examination of the reported cases. In *Evelyn Byrnes, supra,* the landlord objected to assignment of a women's "salon" to a discount women's clothier, claiming that a discount operation store would be incompatible with the elegance it desired for its building. No detriment, such as a diminution in the value of the building, was shown and this Court approved the assignment.

In *In re Peterson's Ltd.,* 31 B.R. 524 (Bkrtcy.S.D.N.Y. July 15, 1983), this Court held that the intended use by the proposed assignee, a cigar store, of premises leased by a pipe and tobacco shop would not violate the "high class" "no cut rate shop" terms of the lease's use clause and that adequate assurance had been given since the cigar store would sell high quality goods, although at a discount.

In *In re U.L. Radio Corp., supra,* this Court approved the assignment to a bistro of a lease limiting use of the premises to a store providing television service and sale of electrical appliances. In so holding, the Court noted that the landlord failed to adduce evidence demonstrating the actual and substantial detriment it would incur if the court approved the assignment. *See, also, In re Lafayette Radio Electronics Corp.,*

*supra; In re Sapolin Paints, Inc.,* 5 B.R. 412, *supra.*

The court's power to assign a lease, however, is not unlimited. "In the application of the equity contemplated by the Code to each individual case, moderation is all." *In re Evelyn Byrnes, supra,* 32 B.R. 825. But Congress, in § 365(b)(3) of the Code, decreed that the court, in determining whether adequate assurance had been provided in connection with the assumption and assignment of a lease in a shopping center, consider only that the lease's location, use, or exclusivity provisions, *inter alia,* will not be breached "substantially" nor will any tenant mix or balance be disrupted "substantially". Congress thereby indicated that the courts are to afford greater flexibility in the assumption and assignment of other leases. *In re Evelyn Byrnes, supra,* 32 B.R. 825. Such facts are not irrelevant to a § 365(f) determination of adequate assurance regarding other leases, but they assume less importance. *Ibid.*

No substantial detriment has been shown here. The Hotel's refusal to consider the overall suitability of Ms. von Furstenberg as a tenant bespeaks a lack of harm to the Hotel from assignment of the Lease to her. Indeed, it appears that Ms. von Furstenberg will attract the type of clientele desired by the Hotel.

Furthermore, the debtor's shift of its inventory to nearly all men's clothing and the Hotel's indifference to that shift show that the Hotel will incur no real harm from having a boutique on its premises offering clothing for primarily one sex rather than for both.

Its similar indifference to the debtor's sale of accessories demonstrates a lack of harm from Ms. von Furstenberg' intention to sell accessories. And, although the gift shop-newsstand at the Hotel may sell perfume, there is no evidence that it has the exclusive right to do so or that the sale of perfume by Ms. von Furstenberg would be

in violation of the Hotel's lease with the gift shop-newsstand.[5]

In fact, the Hotel will be benefitted. In Ms. von Furstenberg, it will obtain a tenant of considerable substance offering far more financial stability than the debtor. The Hotel has received adequate assurance of future performance of the Lease.

## IV

Furthermore, where the proposed assignee's use of the premises would not violate the Lease, adequate assurance of performance of the lease's use clause has been provided. *In re Evelyn Byrnes,* 32 B.R. 825. Whether there would be a violation is an issue of state law. *Ibid.* Use clause covenants, are to be construed under New York law, wherever possible, to carry out the intent of the parties as gleaned primarily from examination of the lease itself. *Bovin v. Galitzka,* 250 N.Y. 228, 232, 165 N.E. 273 (1929); *Burber v. Jilamb Prime Meat, Inc.,* 115 Misc.2d 976, 977, 455 N.Y.S.2d 44, 46 (Civ.Ct.1982). A material departure from such intended use constitutes a violation of the express terms of the lease. *See, e.g., 30–88 Steinway Street, Inc. v. H.C. Bohack Co.,* 65 Misc.2d 1076, 1080, 319 N.Y.S.2d 679, 683 (Civ.Ct. 1971). Thus, for example, where the lease requires the premises to be used and occupied "only as and for a supermarket," but testimony reveals that, as a percentage of total sales, the sale of food items in the tenant's store was insignificant compared with the sale of men's clothing, the use clause has been violated. *Ibid.*

But the words typically employed in a use clause do not embody concepts sterilized and fixed in time. Rather, such concepts, under New York law, reflect changing customs of trade and require that "the tenant's store must be viewed in the light of modern stores of the same character, in the same commercial setting." *Burber,* 115 Misc.2d at 978, 455 N.Y.S.2d at 46. Accordingly, a clause restricting the use of leased premises for a "food market" was held to permit the tenant to sell household goods and small hardware items in addition to food, the court ruling that:

> It is a matter of common knowledge that most present-day supermarkets and even food markets resemble small department stores in relation to the articles sold therein. The plaintiff's right is to be judged in the light of these modern stores and not by comparison with the rapidly disappearing country or town food store.

*Rosen v. Pustilnik,* 204 N.Y.S.2d 221, 223 (Sup.Ct.1960). *Accord Burber, supra,* ("butcher store" interpreted to permit sale of food and non-food grocery items as accessory to meat products.)

But from the wording of the clause and the subsequent practice of the tenant and landlord, *see In re Evelyn Byrnes, supra,* it is clear that "boutique" is the key word in the clause and any particular balance of male and female clothing was immaterial to the parties. Even after the debtor's shift of its inventory to nearly all men's clothing, the Hotel, seemingly because of its location near numerous shops offering expensive men's and women's clothing, had no concern that the debtor's inventory be sufficiently balanced to service male and female clients of the Hotel. The parties' intention, as demonstrated by that shift without objec-

---

**5.** The Hotel also contends that the Sherry Netherland is akin to a shopping center mostly because it has a concern for leasing to tenants who suit the reputation of the Hotel. Neither the text of § 365 nor its legislative history lends any support to this argument. If any building, because it has more than one or two commercial tenants and therefore a concern for the mixture of tenants leasing space in the building, is considered a shopping center, then § 365(f) would necessarily apply to almost all commercial establishments. Such a reading of the term "shopping center" is too broad. The term is properly limited to Congress' descrip-

tion, *i.e.,* "a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement." H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977) *reported in* 1978 *U.S.Code & Ad.News* 5787, 5963, 6305. No such lease or financing agreement has been shown here. Fifth Avenue Originals is located in a building which provides secondary commercial space incidental to the building's main function as a hotel. See *U.L. Radio Corp.,* 19 B.R. at 542, 6 C.B.C.2d at 435.

tion, is that they intended for the premises to be used as a clothing "boutique" with no concern as to whether clothes were offered primarily or exclusively for either sex. The evidence strongly indicates the Lease terms "male and female clothing" are to be interpreted to permit so that both types of clothes be offered for sale and not to require any particular balance. Ms. von Furstenberg's plan to operate a women's clothing boutique, offering primarily women's clothing and also some "unisex-type" clothes that could be worn by either men or women is thus not prohibited by the Lease's use clause.

As a "boutique," the debtor, similarly without objection from the Hotel, sold a fairly broad range of accessories "in the fashion." Ms. von Furstenberg intends to do no more and no less. Some of the accessories may differ in kind from those sold by the debtor. The accessory nature of Ms. von Furstenberg's perfume to the clothing she plans to sell is not, however, seriously disputed. Unlike *Bohack* where the nature of the store would change from a supermarket to a clothing store, and unlike *18th Avenue Pharmacy v. Wilmant Realty Corp.,* 95 N.Y.S.2d 534 (Sup.Ct.1950) where a portion of a drugstore was sought to be subleased to a watchmaker, here the nature of the store will remain a boutique selling primarily clothing but also accessories of the same general genre. Whatever concern the Hotel may have that the store attract primarily well-heeled clientele to the Hotel premises is more than satisfied by Ms. von Furstenberg's planned operation. Under the law of New York, the sale of accessories, including perfume, as intended by Ms. von Furstenberg, does not violate the use clause. Adequate assurance of future performance, for that separate reason has been provided.

## V

■ Nor is the assignment to Ms. von Furstenberg precluded by the Hotel's claim that the Lease is in default due to the alleged transfer or surrender of Amiel's Internaco shares. Complementing the policy considerations advanced by the Code and the authority interpreting it, stands the state law notion that forfeitures of leases are unfavored. *Gillette Bros. v. Aristocrat Restaurant,* 239 N.Y. 87, 145 N.E. 748 (1924); *Nathan's Famous, Inc. v. Frankorama, Inc.,* 70 Misc.2d 452, 333 N.Y.S.2d 708 (Civ.Ct.1972). The burden of proof is on the landlord to prove a forfeiture by a preponderance of the evidence.

■ The Hotel has not satisfied that burden. While Ms. Perez' deposition testimony is unequivocal to the point that she had been told that Ms. Eichenholtz was an Internaco shareholder, nowhere did she state that she was informed what had happened to the Amiel shares. It is difficult to credit her testimony and her letter with much weight given the errors that can occur in telephonic transcription, her status as bookkeeper, her admitted lack of direct knowledge of the identity of the Internaco shareholders and the inability of this Court to judge her credibility in person.

Ms. Eichenholtz appeared to be a credible witness in testifying that Ms. Perez called the Hotel on her own and in denying that she ever held Internaco shares. The Court is aware of the opportunities to fake corporate documents, but cross-examination of Ms. Eichenholtz failed to reveal even circumstantial evidence of any such conduct in this case except perhaps in the four missing stock certificates, no explanation for which has been furnished.

The testimony of Mr. Amiel is discounted in view of the testimony of the Hotel's former secretary-treasurer of his conversation with Mr. Amiel in the Fall of 1981. But it is noted that the statement attributed to Mr. Amiel that he was no longer a shareholder is rebutted by Amiel's testimony of later having received his stock certificate and could be a misinterpretation of a statement that Amiel was no longer affiliated with the debtor as its president. This is particularly so here because grounds for discounting the testimony of the Hotel's former secretary-treasurer also exist. He denied the presence of accessories in the store—the same accessories subsequently

testified to as being present by the Hotel Manager.

The record is far too speculative to permit a finding that Mr. Amiel does not now own one-third of Internaco. Despite the availability of federal discovery procedures and subpoenae since April 15, 1983, when the Hotel first raised this issue in this Court, and despite the availability of discovery procedures and subpoenae in an earlier, unresolved, state court proceeding concerning this issue, no further witnesses were called to substantiate the claim by a preponderance of the evidence.

Secondly, the Hotel takes the position that by terms of the clause in question, a transfer of Amiel's shares would result in an assignment without the consent of the Hotel. The Hotel concedes that although the Lease does not so provide, state law would imply a covenant that the Hotel could not unreasonably withhold consent to an assignment. Record at 77. The landlord, here the Hotel, bears the burden of proof that its failure to consent was reasonable. *E.g., In re Speare,* 360 F.2d 882, 885 (2d Cir.1966).

Whatever reputation Mr. Amiel may enjoy in the trade or what skill he brought to the debtor and, consequently, why the Hotel valued Mr. Amiel so highly is, however, not revealed by the record. Rather, the Hotel merely asserts that, if Mr. Amiel's Internaco shares were transferred or surrendered, the Lease would be in default. The Hotel accordingly has not proven that its refusal to consent to any such purported "assignment," if Mr. Amiel no longer owned a third of Internaco, was reasonable and that, therefore, a default existed.

■ Furthermore, it appears that the alleged default due to the purported assignment was waived by the Hotel in accepting payment of rent. However disfavored termination clauses may be, they are enforceable unless waived or if the landlord is estopped from asserting the right to use them. *Davidson v. Shivitz,* 354 F.2d 946 (2d Cir.1966); *Gordon & Gordon v. Madavin, Ltd.,* 108 Misc.2d 349, 441 N.Y.S.2d Sup. 148 (Sup.Ct.1981). As explained by Judge Duf-

fy in *In re Duplan Corp.,* 473 F.Supp. 1089 (S.D.N.Y.1979), acceptance of rent with knowledge of the breach is evidence of intentional waiver:

> [U]pon a breach courts will deem a forfeiture provision waived when by his conduct a landlord evinces "an intent to treat the lease as continuing rather than as terminated." *BJM Realty Corp. v. Ruggieri,* 326 F.2d 281, 282 (2d Cir.1964). This intent to waive the benefits of a forfeiture clause is most often inferred from the acceptance of rent which accrues after the lessee's breach. *Id.* at 283 and cases cited therein. This is true even where the lease, as in the case at bar, expressly provides that the acceptance of rent after the breach does not constitute a waiver of the forfeiture provision. *Geraghty v. Kiamie Fifth Avenue Corp.,* 210 F.2d 95 (2d Cir.1954). It is, in the final analysis, a question of intent.

*Id.* at 1091–92.

There is no question here of actual knowledge of the purported transfer. As early as November, 1981, the Hotel, in response to its inquiry, had received Ms. Perez' letter indicating that Amiel did not own Internaco shares. Thus, by demanding and accepting use and occupancy payments equivalent to the rent with knowledge of the purported assignment, the Hotel is deemed to have intended to have waived the clause requiring Amiel's ownership of a third of the issued and outstanding stock of Internaco. It had every opportunity to claim such a termination on three separate occasions before this Court. Rather, it chose to demand and accept rent.

Far less compelling circumstances were presented in *In re Duplan Corp.,* 473 F.Supp. 1089. There, knowledge of an assignment was inferred through change of possession and amendment of the directory. Acceptance of the rent after those events was found to evidence "an intent to waive the forfeiture provisions of the lease." *Id.,* 473 F.Supp. at 1093. Similarly, in *B.J.M. Realty Corp. v. Ruggieri,* 338 F.2d 653 (2d Cir.1964), a landlord's acceptance of rent after having been informed by the return

of an earlier rent check bearing the notation that the tenant had filed a Chapter XI petition was found by the Second Circuit to constitute substantial evidence of waiver of a bankruptcy clause in a lease. We thus hold that, even were it proven that Mr. Amiel is not the owner of one-third of Internaco, the Hotel has waived its claim that the lease is in default on that ground.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The debtor's motion to assume and assign the Lease to Ms. von Furstenberg is granted.

Settle Order on notice, no costs.