**In re EASTERN SYSTEMS, INC., Debtor.**

**EASTERN SYSTEMS, INC., Plaintiff,**

v.

**WEST 45TH STREET INDUSTRIAL CONDOMINIUMS, INC. and New York State Urban Development Corporation, Defendants.**

**Bankruptcy No. 87B–12551 (HCB). Adv. No. 87–6305A.**

United States Bankruptcy Court, S.D. New York.

July 19, 1989.

---

Morrison Cohen & Singer, New York City, by Malcolm I. Lewin, for plaintiff.

Wood, Williams, Rafalsky & Harris, New York City, by Paul T. Williams, Jr., for defendants.

## DECISION AND ORDER

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

Eastern Systems, Inc., Debtor and Plaintiff herein, commenced this adversary proceeding against West 45th Street Industrial Condominiums, Inc. and New York Urban Development Corporation, Defendants herein, seeking, *inter alia*, specific performance of the sale of two floors of commercial real estate pursuant to the exercise of two purchase options held by the Debtor as lessee of said realty. A trial on this matter was held before this Court on March 8, 9 and 10 of 1989. Post–Trial submissions were completed on June 1, 1989. Because the evidence shows that the Debtor was in substantial default in its rental payments at the time it sought to exercise the options, we find that Defendants' rejection of that exercise was proper.

**1.** All references are to exhibits admitted into evidence or the trial transcript, unless otherwise

I

Eastern Systems, Inc. ("Eastern", "Debtor" or "Plaintiff") is a New York corporation that manufactures business forms and accessories. On January 1, 1978, it entered into two lease agreements (the "Leases") with West 45th Street Industrial Condominiums, Inc. ("West 45th Street"), a corporate governmental agency of New York State and a wholly-owned subsidiary of New York State Urban Development Corporation ("UDC"). Under the Leases, Eastern agreed to lease as Tenant and West 45th Street agreed to rent as Landlord the entire sixth floor and part of the seventh floor of an industrial building located at 545–555 West 45th Street in Manhattan (the "Premises"). Plaintiff's Trial Exhibit 1.[1] By their own terms, the Leases were for a ten year period, expiring on December 31, 1987. *Id.*

The rent for the entire sixth floor ("Unit 6") under the lease was $22,500 per annum or $1,875 per month. *Id.* The rent for part of the seventh floor ("Unit 7") was $11,500 per annum or $958.33 per month. *Id.* The Lease for Unit 7 also provided that additional space on the seventh floor would be leased to Eastern commencing January 1, 1980, at which time the rent would be increased annually by $11,000. *Id.* Unit 7 Lease, Article 45.

Hence, before January 1, 1980, the cumulative rent under both Leases was $34,000 per annum or $2,833.33 per month. With the rental of additional space on the seventh floor commencing January 1, 1980, that figure would increase to $45,000 per annum or $3,750 per month. *Id.* From the inception of the Leases up until the date the Debtor sought to exercise the options described *infra*, December 31, 1981 (the "Option Date"), Eastern's rental bills were sent on a monthly basis in the amount of $2,833.33 for both Units 6 and 7. Pre–Trial Order, Undisputed Facts # 5(d). Thus, as of the Option Date, Eastern was not billed for additional space on the seventh floor, as provided in Article 45 of the Lease for Unit

indicated.

7, for the years 1980 and 1981. Plaintiff's Trial Exhibit 39. In addition, in June of 1978, UDC granted rent credits to Eastern of $17,812.50 and $9,104.14, for a total of $26,916.64. Pre–Trial Order, Undisputed Facts # 5(e).

Each of the Leases contained a "Non Waiver" clause. Plaintiff's Trial Exhibit 1. That clause, set forth in Article 24 of both Leases states, *inter alia,*

> The failure of Landlord to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations set forth or hereafter adopted by Landlord, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Landlord of rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach and no provision of this lease shall be deemed to have been waived by Landlord unless such waiver be in writing signed by Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check of payment as rent be deemed an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this lease provided.

*Id.*

The Leases also contained default provisions, set forth in Article 17. That Article stated, *inter alia.*

> [I]f tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required (for more than five days (5) after notice of such default) then and in any of such events Landlord may without notice, enter the demised premises either by force or oth-

erwise, and dispossess Tenant by summary proceedings or otherwise....

Plaintiff's Trial Exhibit 1, Article 17 (parenthetical clause indicates language added by parties to the "Standard Form of Loft Lease.")

On the same day that the Leases were executed, Eastern and West 45th Street entered into two separate option agreements whereby West 45th Street, as Seller, granted to Eastern, as Purchaser, the option to purchase Units 6 and 7 (the "Options" or "Option Agreements"). Plaintiff's Trial Exhibit 2. Two separate purchase agreements, to be executed upon the exercise of the Options, accompanied the Option Agreements (the "Purchase Agreements"). *Id.* The purchase prices for Unit 6 and Unit 7 under the Purchase Agreements were $130,000 and $125,000, respectively. *Id.* Under the terms of the Options, they were exercisable at any time on or before December 31, 1981 by the Purchaser giving written notice to the Seller of its intention to exercise the Options. *Id.* Options ¶ 2. Notice of the exercise of each Option, for Units 6 and 7, was to be accompanied by the Purchase Agreements executed by Eastern along with a ten per cent down payment for each unit. *Id.* Options ¶ 3. Pertinent to the dispute before us, the Options were exercisable pursuant to the terms mentioned *"[p]rovided Purchaser shall not then be in default under any of the terms, covenants or conditions of either of the Leases on Purchaser's part to be observed or performed ...."* *Id.* Options ¶ 2 (emphasis added). While the Options were signed by both West 45th Street and Eastern, the Purchase Agreements were signed only by Eastern. *Id.*

Eastern timely exercised both Options on December 31, 1981, in a letter signed by its president, L. James Leyton and accompanied by two checks in the total amount of $25,500 as down payment. Plaintiff's Trial Exhibit 33. The record indicates that at the time the checks were tendered on December 31, 1981 and for a period of twelve consecutive days thereafter, Eastern lacked sufficient funds in its bank account to cover the amount of the checks. Defen-

dants' Trial Exhibit TT; Transcript 436–37. On January 25, 1982, Clifford Stein, Esq. of the New York State Mortgage Loan Enforcement and Administration Corporation ("MLC"), a UDC subsidiary which handled legal matters for the UDC, responded in writing to Eastern's attempted exercise of the Options. Plaintiff's Trial Exhibit 45. The Stein letter, in essence, notified Mr. Leyton that, as of December 3, 1981, Eastern was in arrears in the amount of $12,133.94 for Unit 6 and part of Unit 7. In addition, $22,000 was due for the additional space rented in Unit 7 pursuant to Article 45 of Unit 7 Lease. The letter also stated that the Options could be exercised only if those items were satisfied within a reasonable time. *Id.* Eastern failed to make the payments and, in a letter dated April 19, 1982 from Peter Pellegrino, Vice President of West 45th Street, Eastern was notified that the Options had expired as of December 31, 1981 and were "null and void and of no force and effect." Plaintiff's Trial Exhibit 50.

The facts as set forth thus far are undisputed by the parties. What is disputed is (i) whether Eastern was in default at the time of the Option exercise and (ii) if Eastern was in default, whether that default was waived by UDC both prior to and after December 31, 1981. We shall analyze the disputed facts in a bifurcated fashion. First, we will examine the rental relationship between Eastern and West 45th Street prior to December 31, 1981 and assess the arrearages, if any, prior to that date. In addition, we will look to see whether any default was waived prior to the Option Date. Second, we will look to the parties' relationship after December 31, 1981 and determine those same issues.

The evidence demonstrates that prior to December 31, 1981, Eastern had a history of arrearages in its rental payments. For example, on June 9, 1980, Nancy O'Brien, Loan Administrator for MLC, wrote to Mr. Leyton notifying him that as of May 1, 1980 $31,163.00 was due and owing, covering eleven monthly payments of $2,833 per month. Plaintiff's Trial Exhibit 14. Leyton responded in a letter dated June 30, 1980 setting forth a schedule whereby

Eastern could become current under its obligations to UDC. Plaintiff's Trial Exhibit 15. Under that schedule, $31,163.00 in "total catchup payments," would be completed by June 15, 1981. *Id.* In a July 7, 1980 letter to O'Brien, Leyton acknowledged that the amount past due had increased to $33,996 and that Eastern would undertake to pay that amount by March 31, 1981. Plaintiff's Trial Exhibit 16. Leyton's schedule of payments provided that beginning with July's base rental payments, Eastern would add an amount of at least $1500 to each monthly base rental payment in order to bring Eastern's account current. *Id.* In a letter sent by Karen Rozenberg, Esq. of the MLC which confirmed the terms of Eastern's repayment plan, dated July 25, 1980, MLC stated that if Eastern failed to make either a base monthly rent payment or a scheduled arrears payment the Landlord could "demand payment of the entire amount of rent due and payable under the Lease at the time of such non-payment plus interest." Plaintiff's Trial Exhibit 18.

Eastern did not comply with the repayment plan. On February 5, 1981, Nancy O'Brien sent Mr. Leyton a letter notifying him that the "schedule of payment arrears plus monthly rent has not been adhered to on a regular basis." Plaintiff's Trial Exhibit No. 20. On March 9, 1981 Miss O'Brien sent Mr. Leyton another letter, setting forth

> After reviewing our records, we have adjusted the balance due on arrearages to $3,996.00 as of February 1, 1981. In addition, all rent payments are current as of February 1, 1981.

Plaintiff's Trial Exhibit 24. Hence, as of March 9, 1981, Eastern was on notice that it was in arrears in the amount of $3,996. Leyton challenged this amount and told O'Brien that "we [Eastern] would do nothing regarding the arrearage until it was clear." Transcript 342. After the March 1981 conversations between Leyton and O'Brien, UDC continued to send invoices each month indicating arrearages in Eastern's account. Trial Exhibit UU. The last invoice, dated December 23, 1981 indicated

that the amount of arrearage was $12,-133.94. *Id.*

In November 1981, George Lehr, attorney for Eastern called UDC requesting an extension of time in which to exercise the Options. Plaintiff's Trial Exhibit 29. Peter Pellegrino, responsible for collection of rents and space allocation at UDC indicated to Lehr that the purchase prices under the Options did not adequately reflect the value of the realty and that if UDC were to consider any type of extension, UDC "would want a substantially higher price as well as cash consideration." *Id.* As of November 30, 1981, one month before the expiration of the Option date, Eastern was notified, therefore, that UDC would not consent to an extension under the existing Option agreements, and that any such extension would entail the negotiation of a new deal. Transcript 178. At that time, rent invoices as of November 1981 showed Eastern to be in arrears in the amount of $9,300.61. Defendant's Trial Exhibit UU. On December 23, 1981 Eastern received another invoice which indicated it was in arrears in the amount of $12,133.94. *Id.* Thus, as of December 23, 1981 Eastern was on notice that according to UDC's records it was in arrears in the amount of $12,-133.94. The president of Eastern acknowledged the receipt of that invoice at trial. Transcript 427. Leyton further testified that at the time he sought to exercise the Options, December 31, 1981, he did not tender rent for either November 1981 or December 1981 as billed $2,833.33 per month nor the $3,996 arrearages as set forth in the March 9, 1981 letter from O'Brien, which he disputed. Transcript 429–30. Eastern has conceded, therefore, that it was on notice as of December 31, 1981 that, according to UDC's records, it was in arrears at least in the amount of $9,662.66 ($3996 in disputed rent arrears plus $2833.33 for November and $2833.33 for December), but that it did not tender this amount prior to nor contemporaneously with its attempt to exercise the Options. *Id.* Thus, on December 31, 1981, when Leyton sent two checks totalling $25,500 as down payment to purchase Units 6 and 7, it

did so with the belief that it was in arrears in the amount of at least $9,662.66.

Eastern's "Summary of UDC Bills and Eastern Systems' Payments—January 1978—December 1981," demonstrates as well that, as of the Option Date, Eastern was in arrears, but in the amount of $12,133.94. Plaintiff's Trial Exhibit 78. That summary indicates that UDC sent forty-eight monthly bills in the amount of $2,833.33 each, totalling $135,999.84 for the period between January 1978 and December 1981. *Id.* Totalling the rental payments under that summary sheet, but excluding two payments of $2,833.33 submitted on January 15, 1982, Eastern paid a total amount of $96,949.26. Adding to that amount rental credits of $26,916.64, Eastern paid a total of $123,865.90 in rent and rent credits for that period. This figure is $12,133.94 less than that billed by U.D.C. Hence, Eastern's own summary sheet for the period ending on December 31, 1981 showed it to be in arrears in base rent in the amount claimed by UDC, $12,133.94.

This analysis corresponds with that done by Harry Rosenthal, grants administrator for UDC, on January 12, 1982 and revised as of January 20, 1982, after the attempted exercise of the Options. Plaintiff's Trial Exhibit 43, Transcript 227–229. The evidence, therefore, clearly indicates, by the accounts of both Eastern and UDC, as of December 31, 1981 Eastern was in arrears in base rent in the amount of $12,133.94.

While Eastern disputes this sum, it only need be clarified here that it concedes a default in base rent for November and December and thus had defaulted under the Leases.

In addition to the base rent arrears set forth above, Eastern also owed the amount of $22,000 for the additional $11,000 per annum for the extra space leased on the seventh floor pursuant to Article 45 of that Lease for 1980 and 1981. Hence, as of December 31, 1981 Eastern's total arrears was $34,133.94. The testimony of Eastern's president is clear that at the inception of the Leases, Eastern knew that the base rent on the seventh floor would increase by $11,000 per year and that the increase was

the reason the security deposit tendered was in the amount of $3,750 rather than $2,833.33. Transcript 430. Leyton also testified that he had no communication with either West 45th Street or UDC whereby they waived the right to collect rent for the extra space on the seventh floor, Transcript 431–32, and in fact, Eastern began to pay the increased rent in October 1982. *Id.* at 433. The Defendants' failure to bill Eastern for the extra space on the seventh floor was unintentional and the evidence indicates that when the mistake was realized, Eastern was notified as soon as possible during a conference call between the parties. Plaintiff's Trial Exhibit 38. Eastern's president has characterized the memorandum documenting that conference call and setting forth the arrears pursuant to Article 45 of the seventh floor lease as being accurate. Transcript 392.

We now turn to events which took place after the attempted exercise of the Options. As already stated, Eastern timely tendered two checks in the total amount of $25,500 on December 31, 1981. Plaintiff's Trial Exhibit 33. The next communication between Eastern and UDC took place on January 4, 1982 by way of a telephone call from Pete Pellegrino of the UDC. According to Leyton's testimony, Pellegrino congratulated Eastern for having exercised the Options, asked whether Eastern wanted a slowed or delayed closing and mentioned that there was an arearage in the sum of approximately $9,300. According to Leyton, Pellegrino indicated that the arrearage was something that could be handled at closing. Transcript 389.

The next communication between Eastern and UDC took place on January 11, 1982 by way of a conference call between Mssrs. Stein and Pellegrino, representing UDC, and Leyton along with his attorney, Howard Teitel. Transcript 390. That conference call was the subject of a UDC memorandum admitted into evidence as Plaintiff's Trial Exhibit 38. At trial, Leyton testified that that memorandum "covered all the facts that relat[ed] to the conversation of January 11, 1982." Transcript at 392. That memo, documenting the conference call indicated that Mr. Stein of UDC "informed Mr. Tytel [sic] and Mr. Leyton of certain matters which may have an impact on their exercise of the Option to Purchase." Plaintiff's Trial Exhibit 38. Stein's memo indicated that Eastern was informed of the following issues:

a) December rent for both floors appears to be open;

b) The question of $9,300 arrearage;

c) The provisions of the Article 45 of the Unit 7 Lease requiring Eastern Systems to take possession of the remaining portion of the seventh floor, effective January, 1980 at an increased rental of $11,000 per year;

d) Escalations and pass throughs which may not have been filled, but which are owing to UDC under terms of both leases.

*Id.* The memo also indicated that UDC explained to Eastern's attorney that it, UDC, "would be willing to live up to the terms of both Option Agreements provided we could reach amicable settlement of the above open issues." *Id.* Apparently, Eastern's attorney had requested "a detailed letter explaining the nature of the arrears and [Eastern's] computation of them" and Stein indicated that MLC was waiting on final figures from UDC and that Eastern's counsel would be receiving a letter from UDC shortly. *Id.*

Then, on January 25, 1982, Eastern received a letter from Stein of the MLC. That letter addressed to Eastern's president stated, *inter alia,*

As of December 31, 1981, the sum of $12,133.94 remains unpaid as rental arrears for your occupancy of Unit 6 and a portion of Unit 7. A breakdown of billings and receipts since the leases' inception is attached. An additional $22,000 is due through December 31, 1981 for the additional space taken on Unit 7 pursuant to Article 45 of that lease. Escalation provisions based on increased operating costs are presently being computed and will be billed according to Article 44 of both leases.

As I am sure you are aware, the terms of both Option Agreements require that the Purchaser "not then be in default under any of the terms, covenants, or conditions of either of the Leases ..." upon the exercise of the Option. As we have explained, we are willing to waive this provision and execute the Purchase Agreements for the sixth and seventh Units at the Option Price, *provided the open items as specified above are satisfied within a reasonable period of time.* We have not deposited your checks, made payable to the Chase Manhattan Bank, N.A., and are returning them to you herewith.

Plaintiff's Trial Exhibit 45. (emphasis added.)

The discrepancy between the amount of $12,133.94 arrearages as set forth in the January 25, 1982 letter and the figure of approximately $9,300 previously referred to in the telephone conversation of January 4, 1982 and the conference call of January 11, 1982 was reconciled in the updated summary done by Harry Rosenthal of UDC on January 20, 1982 which determined that $12,133.94 was the correct figure, Plaintiff's Trial Exhibit 43, and in Eastern's own summary as well. Plaintiff's Trial Exhibit 78.

Eastern never made its arrearage payments. On April 19, 1982 Peter Pellegrino, Vice President of West 45th Street notified Eastern that the Options had expired as of December 31, 1981 and were "null and void and of no force and effect." Plaintiff's Trial Exhibit 50.

Eastern continued to occupy the space on the 6th and 7th floors under the Leases, which expired on December 31, 1987. In December 1982, Defendants commenced a proceeding against Eastern in the Civil Court in New York County seeking to evict Eastern claiming that it owed rental fees on the sixth and seventh floors in the amount of $64,557.01 (Landlord and Tenant No. 114256/82) In August 1986, West 45th Street and UDC commenced another action seeking eviction of Eastern due to non-payment of rent in the amount of $165,770.60 (Landlord and Tenant No. 69334/86).

On December 30, 1987 Eastern filed for bankruptcy under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 1101 *et. seq.* That same day, Eastern served a summons and complaint on West 45th Street and UDC. *Eastern Systems, Inc. v. West 45th Street Industrial Condominium, Inc. and New York State Urban Development Corporation,* Adversary Proceeding No. 87–6305A (the "Complaint"). The complaint sets forth six causes of action. The first cause of action seeks a declaration of the validity of Eastern's exercise of the two Options. Essentially, Eastern's first cause of action asserts that West 45th Street and UDC accepted Eastern's exercise of the Option, and, to the extent Eastern owed any rent, that arrears was waived. Complaint ¶¶ 33–37. As for a second cause of action, Eastern alleges breach of contract and asks that this Court direct specific performance of the sale of the 6th and 7th floors of 545 West 45th Street. *Id.* ¶¶ 38–39. The third cause of action is also for breach of contract and estimated monetary damages in the amount of approximately $1.3 million. *Id.* ¶ 40. The fourth cause of action, based on promissory estoppel, asserts that due to defendants' alleged promises to keep the Options open pending a resolution of dispute on rent arrearages, upon which Eastern relied, Eastern suffered monetary damages in excess of $1.3 million. *Id.* ¶¶ 41–44. The fifth cause of action, based on fraud, alleges that Eastern suffered damages in the amount of approximately $1.3 million, the difference between the Options price and the present market value of the Premises. *Id.* ¶ 45. The sixth cause of action alleges that defendants' conduct constituted deceptive business practices in violation of Section 349 of New York's General Business Law, and seeks damages in excess of $1.3 million plus reasonable attorneys fees. *Id.* ¶¶ 46–48.

The Defendants' answer, in addition to setting forth seven affirmative defenses to the allegations set forth in the Complaint, Answer ¶¶ 16–22, contains three counterclaims. Answer ¶¶ 23–31. The first counterclaim alleges that notwithstanding the

expiration of the Leases on December 31, 1987, Eastern continues to occupy the premises without the express or implied consent of either West 45th Street or UDC, and, accordingly, the Defendants ask for an order granting them immediate possession of the 6th and 7th floors of 545 West 45th Street. *Id.* ¶¶ 23–26. The second counterclaim is for damages in the amount of $185,450.66 for base rent and additional rent due and owing from Eastern. *Id.* ¶¶ 27–29. The third counterclaim is for attorneys fees and reasonable expenses incurred by West 45th Street. *Id.* ¶¶ 30–31.[2]

Procedurally, two prior substantive motions were heard by this Court. In January 1988, defendants moved for an order modifying the automatic stay and asking that this Court abstain from exercising its jurisdiction. The motion was denied. In October 1988, defendants moved and plaintiffs cross-moved for summary judgment and the Court denied both motions. Pre-Trial Order ¶ 9. A trial was held before this Court on March 8, 9 and 10, 1989.[3] Jurisdiction over this proceeding is vested in this Court pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" dated July 10, 1984 (Ward, Acting C.J.). Since the gravamen of the action is to recover alleged properties of the estate, the proceeding is a core proceeding under 28 U.S.C. § 157(b).

## II

As set forth in the parties' Pre-Trial Order and Post-Trial Findings of Fact and Conclusions of Law, the legal issues in this case can be summarized as follows. The Plaintiff presents four issues: (i) whether Eastern was in "default" under its Leases when it exercised its Options; (ii) were Defendants estopped from claiming Eastern was in default because of their conduct, correspondence and conversations with Eastern, and their billings and acceptance of rent thereunder; (iii) if Eastern was in default, was such default waived by Defendants' correspondence, internal memos, conduct and acceptance of rent; and, (iv) should this Court act to prevent UDC from causing a forfeiture of Eastern's rights. As for the Defendants, three issues of law are presented: (i) does a waiver arise when a landlord mistakenly misstates the amount of base rent due under a written lease in its monthly invoices to a tenant; (ii) is the offer to purchase real property under an option agreement rejected when the optionee's tender of payment is returned by the seller; and, (iii) may an offer to purchase real property under a written option agreement be properly rejected when the optionee has failed to comply with the express terms and condition of the option agreement. Pre-Trial Order 14–15.

These issues of law as presented by the parties are analyzed and incorporated in our conclusions of law as set forth below.

## A.

Eastern asserts that the Leases and Options were negotiated together as part and

---

2. The Defendants' counterclaim for attorneys fees has been withdrawn without prejudice to their submitting proof of such a claim.

3. The Debtor has asked us to rule on the admissibility of Plaintiff's Exhibit No. 23, which, although Defendants stipulated to be authentic, was inadvertently not offered into evidence. Debtor's Letter of April 28, 1989. UDC has objected on the grounds that (i) the exhibit was not offered into evidence and (ii) it contains multiple hearsay.

Exhibit 23 is a UDC memorandum from Louisa Knight to Nancy O'Brien regarding Eastern Systems. It states:

As requestd, enclosed is a statement of the above mentioned account.
A credit adjustment of $12,212.29 has been put through in order to amend our records to

agree with balance outstanding, as discussed, as per letter dated 7/25/80 from Karen Rosenberg to Eastern Systems, Inc.
I also spoke with Rob Biesenbach of Eastern Systems who said that he mailed two checks dated 2/17/81 totalling $7,833.33 which would reduce the balance due to UDC on arrearage to $3,996.00.
All current rent bills have been paid.
*Id.*

Paragraphs 1, 2 and 4 are admissible under Rule 803(6) F.R. Evid. under the "business record" exception. Paragraph 3, however, is admissible only for the purpose of proving the fact that a conversation took place, but not for proving the truth thereof.

parcel of a single unified transaction, Transcript 316, and, that it would not have entered into the Leases without the Options to buy the Premises. *Id.* 317. Although the Leases were executed in January 1978, Eastern states that it waited five months to move in, due to substantial construction and compliance with building codes and that it spent approximately $200,000 in improvements. *Id.* 319. According to Eastern, it would not have spent that money if it did not have an option to buy the Premises. *Id.* 321. UDC asserts that the Leases and Options were separate and distinct, that the only connection between the two was that a breach of the Leases prevented Eastern from exercising the Options. Without resorting to this parol evidence in interpreting the documents, we find that the Leases and Options arose out of the same transaction.

■ In construing the Leases and Options in this case, we recognize the general rule which provides that instruments executed at substantially the same time, by the same parties and relating to the same subject matter are to be read and interpreted together as one instrument. *Nau v. Vulcan Rail & Construction Co.,* 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (Ct.App.1941). This is particularly so in the case of real property leases. *Bistrian v. Easthampton Sand & Gravel Co., Inc. (In re Easthampton Sand & Gravel Co., Inc.,* 25 B.R. 193, 198–99 (Bankr.E.D.N.Y.1982); (lease of concrete business and promissory note interpreted together since both documents arose from same transaction and were conditionally dependent upon each other. Default on note could be considered default on lease since note was major consideration in effectuating lease of premises.); *BWA Corp. v. Alltrans Express U.S.A., Inc.,* 112 A.D.2d 850, 493 N.Y.S.2d 1, 3 (1st Dept. 1985) (letter agreement executed contemporaneously with commercial lease read as one agreement); *Riverview Apartment Co. v. Golos,* 97 A.D.2d 917, 470 N.Y.S.2d 758, 760 (3d Dept.1983) (lease and management agreement interpreted together); *North Shore Mart v. Grand Union Company,* 58 Misc.2d 640, 296 N.Y.S.2d 855, 858 (Dist.Ct.Nassau Co.1968) (lease and

"supplemental agreement" providing that landlord could acquire ownership of land found to be one transaction).

■ As we have previously stated, under New York law, a contract or lease is construed according to the expressed intent of the parties, *In re Evelyn Byrnes, Inc.,* 32 B.R. 825, 831 (Bankr.S.D.N.Y.1983) (citations omitted) and that the best intention is usually found in the language of the lease. *Id.* Hence, unless an ambiguity is found and proof of the parties subjective intent is proffered, the Court will not look beyond the four corners of the lease when construing its meaning. *Id.,* citing, *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 248–49, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (Ct.App.1975); *Edra Associates v. Deer Park Beauty Corp.,* 91 Misc.2d 896, 398 N.Y.S.2d 841 (Dist.Ct. Suff.Co.1977).

In looking at the Leases, Option Agreements and Purchase Agreements, Plaintiff's Trial Exhibits 1 and 2, we note that both the Leases and Option Agreements were entered into on January 1, 1978; both involve the same parties, namely West 45th Street (as subsidiary of UDC) and Eastern; and that the Option Agreements for Units 6 and 7 refer specifically to the Leases:

Whereas, Seller, as landlord, and Purchaser as tenant, have entered into two (2) leases of even date herewith for the condominium unit designated as Unit No. 6 and a portion of the condominium unit designated as Unit No. 7, respectively

. . .

Plaintiff's Trial Exhibit 2.

Both Option Agreements contain paragraphs stating:

Whereas, Purchaser is interested in acquiring said unit[s] No. 6 [and No. 7], together with an undivided 10.059 percent interest in the Common Elements (collectively the "Unit");

and

Whereas, Seller is willing to grant to Purchaser an option (the "Option") to purchase the Unit[s].

*Id.* Furthermore, the Options provided that if at any time during the term of the

Option Agreements, which by their terms expired on December 31, 1981, either of the Leases should expire for any reason, the Agreement[s] and the Option[s] granted therein would "terminate and come to an end as of the date[s] of the expiration of the leases." *Id.* Option Agreements, ¶ 6. This is not a situation, therefore, where the options could survive termination of the lease, *see, e.g., Hutt v. Johnson,* 135 A.D.2d 501, 522 N.Y.S.2d 9, 10 (2d Dept. 1987), but, rather, the parties' intention that the Leases and Options be construed as one transaction is evident in the unambiguous language of the documents, *see In re Easthampton Sand & Gravel, Co., Inc.* 25 B.R. at 199, and the viability of the Options depended on Eastern's compliance under the Leases.

The interrelationship between the Leases and the Options is clearly evident in Paragraph 2 of the Option Agreements for Units 6 and 7. The language of that paragraph renders the exercise of the Options conditional upon fulfillment of the Lease terms:

> Provided Purchaser shall not then be in default under any of the terms, covenants or conditions of either of the Leases on Purchaser's part to be observed or performed, the Option shall be exercisable at any time on or before December 31, 1981. . . .

Plaintiffs Trial Exhibit 2. Thus, in addition to requiring timely notice, *id.,* execution of the Purchase Agreement, *id.* at ¶ 3, and tender of the down payments, the entire Option Agreement was conditioned upon compliance with the Leases. *Id.*

The option to purchase Units 6 and 7 was an Option contract. An option has been defined as "an irrevocable contract given for consideration, unilateral in form and nature, by which the owner of real property agrees that another shall have the right to buy the property at a certain price and within a stipulated time." *Rottkamp v. Eger,* 74 Misc.2d 858, 346 N.Y.S.2d 120, 126 (Sup.Ct.Suffolk Co.1973) quoting from 62 N.Y.Jur.Vendor & Purchaser § 16. The option must be exercised in strict accordance with the terms of the option, *i.e.,* the offer held open must be unequivocally ac-

cepted. according to its terms and conditions. *Bartholf v. Hautala,* 22 Misc.2d 46, 194 N.Y.S.2d 660, 663 (Sup.Ct.Tompkins Co.1959).

The conditional language set forth in Paragraph 2 of the Options renders it a condition precedent. A condition precedent has been defined "an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises. If the condition does not occur according to the express or implied terms of the agreement and is not excused, the conditional duty is discharged." J. CALAMARI and J. PERILLO, CONTRACTS (2d ed. 1977) § 11–3. (footnotes omitted). An express condition is provided for by the parties, either in words or implied in fact, and, literal compliance with an express condition is usually necessary before a duty of performance becomes absolute *Id.* § 11–7. Hence, if one party fails to fulfill the condition, performance by the other side is excused. In New York, the burden of proof is on the defendant to deny the occurrence of a condition precedent. Once the defendant has made that denial, the burden is on the plaintiff to prove its occurrence. *1014 Fifth Avenue Realty Corp. v. Manhattan Realty Co.,* 67 N.Y.2d 718, 721, 499 N.Y.S.2d 936, 938, 490 N.E.2d 855, 857 (Ct.App.1986); N.Y.CIV. PRAC.R. 3015(a) (McKinney 1974).

In Defendants' Answer, UDC asserts that the condition precedent set out in Paragraph 2 of the Option Agreement has not been complied with by asserting that Eastern was in arrears at "all relevant times" under the Leases. Defendant's Answer ¶ 8.

It is clear that Eastern's obligation to pay rent under its Leases was a major "term, covenant or condition" of those agreements. As the Leases clearly set out:

> The parties hereto, for themselves, their heirs, distributers, executors, administrators, legal representatives, successors and assigns, hereby covenant as follows
>
> 1. Tenant *shall* pay the rent as above and as hereinafter provided.

Plaintiff's Trial Exhibit 1. (emphasis added). A tenant's obligation to timely pay rent has been uniformily held to be a primary obligation under a lease. *National Shoes, Inc. v. Annex Camera and Electronics, Inc.*, 114 Misc.2d 751, 452 N.Y.S.2d 537, 538 (Civ.Ct.N.Y.Co.1982); *Sanfilippo v. Coster*, 91 N.Y.S.2d 738, 740 (Sup.Ct., Kings Co.1949). It has been held in New York that the failure to tender payment of two monthly rental payments or offering to cure the default under a commercial lease was a willful breach of a material term of the lease. *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 575, 415 N.Y.S.2d 800, 801, 389 N.E.2d 113 (Ct.App.1979).

By its own admissions, at the time Eastern attempted to exercise the Options on December 31, 1981, it knew that, according to UDC's records, it was in arrears in base rent in the amount of $9662.66. Transcript 429–30. Hence, as of the Option date, Eastern was in arrears in the amount of at least $9662.66, but, according to the evidence, $12,133.94 was owed in base rent. Plaintiff's Trial Exhibit Nos. 43, 78. This figure did not include the additional $11,000 owed under Article 45 to the Lease for Unit 7 for increased rent for both 1980 and 1981, a total of $22,000. The conditions precedent to exercising the Options, therefore, were not met. Since the Options were exercisable only upon the specific condition that Eastern *not* be in default under the Lease, UDC was justified in rejecting the exercise of the Option.

New York courts have visited, albeit infrequently, the issue before us, i.e. whether an option to purchase realty is rendered void due to the failure of a condition precedent, namely, the fulfillment of obligations under a lease.

■ The determination of whether the breach of a material term of a lease renders an option to purchase thereunder void and unenforceable depends upon whether the option is conditioned upon compliance with the lease, or, whether the option is independent from the lease. That, in turn, depends upon the intention of the parties. *Cohen v. Nonoo*, 101 Misc.2d 1037, 422 N.Y.S.2d 574, 576 (Sup.Ct.N.Y.Co.1979). In *Cohen*, the parties had entered into a two-year sublease of a cooperative apartment. They executed a separate letter purchase option on the same day. The option agreement did not contain any express provision whereby the right to exercise the option was conditional upon full performance under the lease. The tenant failed to make timely rental payments and attempted to exercise the option at a time when there was an accrued rental delinquency outstanding. The lessor contended that the option agreement could not have been exercised at a time when the tenant was in default payments due under the lease, even though the tenant had promptly cured the default upon notice. The Court held that the lessee's exercise of the option was valid. The Court's holding was based on the reasoning that the option was an independent covenant which was exercisable notwithstanding the existence of a default in the rent payment obligations under the lease at the time of the exercise. 422 N.Y. S.2d at 576. The Court added

> In this case the option agreement is contained in a separate subsequent agreement, and not in a clause which is part of the lease. The terms of the separate option agreement clearly refer to the existing lease relationship, but no specific provision conditions the right of exercise on performance or lack of default in the performance of any lease provision ... Even if the lease and the option agreement were to be treated as part of a single agreement, or were in fact contained in single document, their construction would be the same. The rent payment obligation and the option provision are independent provisions. They could have been made dependent, but they were not.

*Id.* at 576.

■ Hence, the determining factor in deciding if an option is rendered void due to a default under a lease is not whether the documents are construed as single transaction or as separate documents, but, more importantly, whether the parties, through their expressed intention, have chosen to

make the exercise of the option conditional upon compliance with the terms of the lease. Here, Eastern contends that the Leases and Options are integrated. Furthermore, the Options' exercise, unlike that in *Cohen*, is expressly conditioned upon fulfillment of all of Eastern's lease obligations.

The *Cohen* decision is based upon a rule enunciated long ago by the New York Court of Appeals in determining whether a right of first renewal under a lease was exercisable at a time when the tenant was in arrears in rent. In *Tracy v. Albany Exchange Co.*, 7 N.Y. 472, 475 (1852), the Court held that since the payment of rent was not a condition precedent to the right of the lessee to renew under the option, he could enforce his right to renew even though he was in default in the payment of rent. *Id.*, citing *Dawson v. Dyer*, 5 Bain. & Ad. 584; *see also Matthews Slate Co. v. New Empire Slate Co.*, 122 F. 972, 981 (C.C.N.D.N.Y.1903) (absent any express provision vitiating or suspending option exercise rights in the event of nonperformance of a lease term, the option was an independent covenant from the other provision in the lease).

█ This case is the converse of those discussed above. Although the New York Courts have not squarely addressed the issue as presented here, in that, in this case, payment of rent under the Lease *is* a condition precedent, it follows from those cases that, if payment of rent under a lease is an express condition precedent to renewal or purchase under an option, a default in payment would render the option void, as other jurisdictions have held. *See, e.g., Brauer v. Freccia*, 159 Conn. 289, 268 A.2d 645 (1970).

We hold that the New York courts would agree and require compliance with the express conditions. To do so accords with the parties' written words and the bargain they struck in their agreement.

### B.

Eastern next argues that, even if it were in arrears at the time it sought to exercise the Options, that default was waived by UDC. Eastern's Post–Trial Findings of Fact and Conclusions of Law 66–72. Specifically, Eastern alleges that UDC knew of Eastern's rent arears, yet continued to accept late rental payments through 1982. *Id.* at 69. By accepting the rent, asserts Eastern, UDC effectively waived any breach of the condition precedent, *i.e.*, that the Options could be exercised only if Eastern were not in default under the Leases. *Id.* In response, UDC argues that waiver is specifically precluded by the non-waiver clause in the Leases, and, that it notified Eastern of the default and did nothing to indicate that it was waiving the condition precedent to the exercise of the Options. Defendants' Proposed Findings of Fact and Conclusion of Law 24–28.

A waiver is the voluntary and intentional abandonment or relinquishment of a known right. It is essentially a matter of intent. *Jefpaul Garage Corp. v. Presbyterian Hospital in City of New York*, 61 N.Y.2d 442, 446, 474 N.Y.S.2d 458, 459, 462 N.E.2d 1176, 1177 (Ct.App.1984). (citations omitted) In *Jefpaul*, the New York Court of Appeals held that where the parties have expressly agreed by the language embodied in a lease to include a non-waiver clause, acceptance of rent with knowledge of a tenant's breach was not a waiver of conditions precedent to renewal of the lease. The non-waiver clause in *Jefpaul* stated:

> The receipt by Landlord of rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach and no provision of this lease shall be deemed to have been waived by Landlord unless such waiver be in writing signed by the Landlord.

*Id.* at 446, 474 N.Y.S.2d 458, 462 N.E.2d 1176. This is the same standardized non-waiver clause agreed to by the parties in this case. Plaintiffs Trial Exhibit 1. In *Jefpaul*, the lessee had brought an action for a declaration that it had validly exercised its renewal option under a commercial lease. The lessee alleged it was prevented from doing so when the lessor notified it that it was in default under the lease for two months rent. The tenant cured the

default, although tardily, and the lessor accepted the late payments. Three months later, the lessor served another notice to cure alleging that the tenant was in violation of the lease, not only because of late payments of rent and taxes, but, that it had also sublet the premises without consent. The tenant then obtained an injunction tolling the cure period after which time the lessor continued to accept rent payments but rejected tenant's exercise of its option to renew.

The Court found that the non-waiver clause should be enforced to preclude a finding of waiver of the conditions precedent to renewal. *Jefpaul*, 61 N.Y.S.2d at 446, 474 N.Y.S.2d 458, 462 N.E.2d 1176. If the tenant were in fact in default and if it failed to cure within the 15–day period allowed, then its notice was ineffective to exercise its option to renew since it had failed to perform necessary conditions precedent. *Id.* at 449, 474 N.Y.S.2d 458, 462 N.E.2d 1176. The Court's reasoning in *Jefpaul*, was based upon the general rule that if a right to renewal is conditional, it cannot be exercised unless the tenant is in full compliance with those conditions. *Id.* at 448, 474 N.Y.S.2d 458, 462 N.E.2d 1176. (citations omitted). *Compare Atkins Waste Materials v. May*, 34 N.Y.2d 422, 358 N.Y.S.2d 129, 314 N.E.2d 871 (1974) (where city as lessor of land accepted rental payments with knowledge of default but did not attempt to give the tenant adequate notice of default, nor take steps to terminate the lease, city had, in essence, waived the default and tenant could exercise option to renew).

Courts have uniformly deferred to the parties' intent, as expressed by non-waiver clauses in leases, and have enforced those clauses to preclude finding of waiver of conditions precedent by a landlord's acceptance of rent. This is the rule for both residential leases, *see, Pollack v. J.A. Green Construction Corp.*, 40 A.D.2d 996, 338 N.Y.S.2d 486, 487 (2d Dept.1972) *aff'd*, 32 N.Y.2d 720, 344 N.Y.S.2d 363, 297 N.E.2d 99 (Ct.App.1973); *Luna Park Housing Corp. v. Besser*, 38 A.D.2d 713, 329 N.Y.S.2d 332–34 (2d Dept.1972) and for commercial leases as well, *see 650 Madison Avenue Corp. v. Wil-low Cafeterias, Inc. (In re Wil-low Cafeterias, Inc.)*, 95 F.2d 306 (2d Cir.), *cert. denied sub nom., Willow Cafeterias, Inc. v. 650 Madison Avenue Corp.*, 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533 (1938); *In re Delta Motor Hotel of Syracuse, Inc.*, 10 B.R. 585 (Bankr.N.D. N.Y.1981); *Dennis & Jimmy's Food Corp.*, 99 A.D.2d 477, 470 N.Y.S.2d 412, 413 (2d Dept.) *aff'd on other grounds* 62 N.Y.2d 613, 476 N.Y.S.2d 116, 464 N.E.2d 484 (Ct. App.1984).

### C.

■ While a landlord's acceptance of rent from a tenant with knowledge of the tenant's violation of the terms of the lease may be deemed a waiver of that violation in many circumstances, *see, e.g., Atkins Waste Materials, Inc. v. May*, 34 N.Y.2d 422, 426, 358 N.Y.S.2d 129, 314 N.E.2d 871; *Woollard v. Schaffer Stores Co.*, 272 N.Y. 304, 312, 5 N.E.2d 829 (Ct.App.1936), such acceptance of rent does not always constitute a waiver. It remains a question of intention, which must be proved. *Jefpaul*, 61 N.Y.2d at 446, 474 N.Y.S.2d 458, 462 N.E.2d 1176.

The law will find a waiver from acceptance of rent to prevent a forfeiture of the leasehold estate. *Realties 1430 v. Slaner, (In re Duplan Corp.)*, 473 F.Supp. 1089, 1091 (S.D.N.Y.1979). But no such forefeiture is at issue here. Instead, the issue is waiver of compliance with a condition precedent to the exercise of an option. That is a wholly different issue and is governed by the objectively ascertained intent of the beneficiary of the condition.

■ We thus turn to an examination of the parties' intention as disclosed by this record. Here, it is clear that UDC did not silently acquiesce in Eastern's non-payment. The monthly billing notices sent by UDC to Eastern clearly indicated arrearages. *See* Defendant's Trial Exhibit UU. The July 1981 invoice indicated that Eastern was in arrears in the amount of $12,133.94 as of June 30, 1981. The November 1981 invoice indicated that Eastern owed $9300.61 as of October 30, 1981. Most

importantly, the last invoice received by Eastern prior to its exercise of the Options, stamped "Received" December 23, 1981, indicated that Eastern's rent arrears totalled $12,133.44. *Id.* Each notice clearly stated the amount of arrearage and the words "Please remit promptly." *Id.*

In addition to the invoices, the correspondence between UDC and Eastern demonstrates that UDC had no intention of relinquishing its right to late payments. For example, in June 1980, Nancy O'Brien, Loan Administrator wrote to Eastern's president notifying him that:

> As of May 1, 1980, we note that 11 monthly payments of $2,833.00 amounting to $31,163.00 are due and owing. This office requires that payment of $31,163.00 be made within thirty days of the date hereof with no extension.

Plaintiff's Trial Exhibit 14. This is clearly not the language of acquiescence. This letter was followed by one dated July 25, 1980 confirming a repayment schedule of past due rent. Plaintiff's Trial Exhibit 18. In February 1981, UDC sent another letter to Eastern indicating that that schedule of repayment had not been complied with. Plaintiff's Trial Exhibit 20. The letter of January 25, 1982 returning the option down payment checks clearly evinces UDC's intention not to waive arrears. Plaintiff's Trial Exhibit 45. Finally, the letter of April 19, 1982, declaring the Options null and void was consistent with UDC's prior statements concerning the arrears. Plaintiff's Trial Exhibit 50.

Likewise, there was no evidence of an intentional waiver of the additional rent owed pursuant to Article 45 of the Lease for Unit 7. Although UDC failed to bill Eastern for the additional rent until after December 31, 1981, this was unintentional. Transcript 292–93. Furthermore, Eastern was notified of the billing mistake as soon UDC realized its error. Plaintiff's Trial Exhibit 38; Transcript 391–392. In his testimony, Eastern's president acknowledged that he knew the base rent was to increase on January 1, 1980 and that a security deposit in the amount of $3,750 rather than $2,833.33 was proof of that increase. Tran-

script 430. Furthermore, Eastern has admitted that UDC never told them that the increase would be waived. Transcript 431–433.

Finally, it is clear from the evidence that UDC never waived strict compliance with the terms of the Option Agreements. In November 1981, one month before the date of exercise of the Options, the attorney for Eastern was told that UDC would want strict compliance with the Option Agreements. Plaintiff's Trial Exhibit No. 29, Transcript 177–78. In addition, in the letter of January 25, 1982, whereby UDC agreed to waive the condition precedent to the exercise of the Option Agreements, it was made clear that that would be done *"provided* the open items as specified above (i.e. $12,133.94 in arrears, $22,000 in additional rent and escalation provisions) [were] satisfied within a reasonable period of time." Plaintiff's Trial Exhibit 45. (emphasis added).

Thus, as to a post-option-Date waiver of arrearages, the evidence indicates that while UDC indicated it was willing to allow Eastern to exercise the Option after the deadline of December 31, 1981, it would do so only if the arrearages and additional rent owed was paid. The communications between the parties after January 1, 1982 do not support the Debtor's argument of waiver, rather, they demonstrate that UDC continually asserted that the Options could be exercised only upon fulfillment of the conditions in the Option Agreements.

The testimony of Eastern's president supports this analysis. On January 4, 1982, during a phone conversation with Peter Pellegrino of UDC, Leyton was advised by Pellegrino that Eastern was in arrears in the amount of approximately $9,300. Transcript 389. Then, on January 11, 1982, during the conference call between UDC and Eastern, as memorialized in a memorandum, UDC informed Eastern that they "would be willing to live up to the terms of both Option Agreements *provided* we could reach amicable settlement of the above open issues." Plaintiff's Trial Exhibit 38. The "open issues" referred to included 1) December rent for both floors;

2) $9,300 arrearage; 3) annual rental increase of $11,000 for the seventh floor unit and 4) escalation and pass through which may not have been billed but which were owing to UDC under the terms of both Leases. *Id.* Mr. Leyton testified that that memo was "essentially accurate" in relating to the facts of the conference call. Transcript 392. Finally, in the letter of January 25, 1982, UDC again told Eastern that those items would have to be complied with if Eastern sought to exercise the Options. That letter reflected the revised arrearage amount of $12,133.94, as calculated by Harry Rosenthal of UDC on January 20, 1982, Plaintiff's Trial Exhibit 43, and an additional $22,000 for the additional space on Unit 7 and provided for escalation provisions. Plaintiff's Trial Exhibit 45.

The letter of January 25, 1982, while stating that it would waive the condition that Eastern *not* be in default under the Leases, emphasized that that waiver and the execution of the Purchase Agreements would take place "provided the open items as specified above are satisfied within a reasonable period of time." *Id.*

Hence, this post-option willingness to waive Eastern's default was expressly conditioned upon compliance with the Leases within a reasonable time. That compliance was not tendered three months later when UDC notified Eastern that the Options were null and void. Plaintiff's Trial Exhibit 50.

This is clearly a case where the parties, by express words and conduct did not intend a waiver, and Eastern has failed to prove otherwise. *Jefpaul,* 61 N.Y.2d at 446, 474 N.Y.S.2d 458, 462 N.E.2d 1176.

### D.

■ Eastern's next argument is based on the theory of equitable estoppel.[4] The

estoppel argument is principally based upon a letter, sent from Nancy O'Brien, the Loan Administrator for UDC dated March 9, 1981 to James Leyton, President of Eastern. The letter advised Leyton that, after reviewing their records, UDC had adjusted the balance due on arrearage to $3,996.00 as of February 1, 1981, Plaintiffs' Trial Exhibit 24, a reference to a letter dated February 5, 1981 in which O'Brien told Leyton that the schedule of payment arrears plus monthly rent had not been adhered to on a monthly basis. Plaintiff's Trial Exhibit 20. The March 9 letter also stated, "In addition, all rent payments are current as of February 1, 1981." Plaintiff's Trial Exhibit 24. In addition to characterizing the March 9, 1981 letter as a representation that its rents were current as of February 1, 1981, Eastern points to monthly rent bills in the amount of $2,833.33 and, argues, therefore, that it was reasonable for Eastern to believe that on December 31, 1981 when it attempted to exercise the Options, its rent was current.

■ The essential elements of equitable estoppel under New York law relating to the party to be estopped are: (1) conduct which amounts to false representation or concealment of material facts or which gives the impression that the facts are otherwise than as asserted, (2) an intention or expectation that such conduct would be relied upon by the other party, and (3) actual or constructive knowledge of real facts. The elements relating to the party asserting the estoppel defense are: (4) lack of knowledge of the real facts, (5) reliance on the conduct of the party to be estopped, and (6) action based thereon resulting in a prejudicial change of position. *In re Delta*

---

**4.** In its complaint, Eastern based its fourth cause of action on the theory of promissory estoppel. Complaint ¶¶ 41–4. In its Findings of Fact and Conclusions of Law, it uses the same factual allegations as predicate acts for equitable estoppel. Eastern Systems, Inc.'s Post–Trial Findings of Fact and Conclusions of Law at 60–66. Although often used interchangeably, the two are separate and distinct doctrines. Under the theory of promissory estoppel a promise unsupported by consideration may be enforced if the promissor reasonably

expected that his promise would induce action or forbearance on the part of the promisee and if such promise does induce such behavior, if injustice can be avoided only by the enforcement of the promise. CALAMARI and PERILLO § 6–1. Equitable estoppel has traditionally been limited to cases where one party has misrepresented a fact to another who detrimentally relies upon such misrepresentation. The courts will estop the party who made that misrepresentation from contradicting it. *Id.*

*Motor Hotel of Syracuse, Inc.,* 10 B.R. 585 at 598, *citing United States v. Bedford Associates,* 491 F.Supp. 851, 866–67 (S.D.N.Y.1980), *modified,* 657 F.2d 1300 (2d Cir. 1981), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). In addition, in order for a Court to invoke the estoppel principle against a landlord, the party claiming injury must show that it acted in good faith. *McClelland v. Robinson,* 94 Misc.2d 308, 309, 405 N.Y.S.2d 163 (Civ.Ct. City of N.Y., N.Y. Co.1978), *motion denied,* 94 Misc.2d 312, 405 N.Y.S.2d 165 (1978).

■■■ Eastern has failed to meet its burden of proof under the theory of equitable estoppel. First, there was no conduct by UDC which amounted to a false representation or concealment of a material fact regarding the rental payments. To the contrary, the evidence demonstrates that UDC repeatedly notified Eastern of its arrearages prior to the Option date. The monthly billing receipts, as late as November and December 1981 showed Eastern to be in default. Defendants' Trial Exhibit UU. Similarly, the correspondence between Eastern and UDC demonstrates UDC's numerous efforts to notify Eastern of its arrearages. Even the letter of March 9, 1981 from Nancy O'Brien, a key element in Eastern's estoppel analysis, showed that as of February 1, 1981, Eastern owed $3,996.00 in arrearages. Plaintiff's Trial Exhibit 24. In June, Eastern received an invoice stating that as of May 30, 1981, the amount of arrears was $12,133.94. Plaintiff's Trial Exhibit 26. The president of Eastern himself acknowledged that, as of the eve of the Option Date, December 23, 1981, he was in receipt of a billing slip indicating an arrearage in the amount of $12,133.94, Transcript 427, and, that Eastern knew its arrearages, as reflected on UDC's records, were in the amount of $9,662.66, when it tendered the down payment on the Options. *Id.* at 429. Thus, the record is clear that UDC repeatedly represented to the Debtor that it was in arrears.

In addition to proving a misrepresentation of fact, Eastern must show reasonable reliance thereon and injury resulting from such reliance. *Philo Smith & Co. v. U.S. Life Corp.,* 420 F.Supp. 1266, 1272 (S.D.N.Y.1976) *aff'd* 554 F.2d 34 (2d Cir.1977). By its own testimony, Eastern admitted that it was aware of its arrears in base rent. Obviously, that knowledge is inconsistent with its alleged reliance on a belief that it was current in its rental payments.

As to the letter of March 9, 1981, upon which Eastern places so much weight, even assuming that UDC represented to Eastern that its rent was current as of February 1, 1981, Eastern cannot genuinely argue that it was reasonable to rely upon a March 1981 correspondence nine months later, when it attempted to exercise the option. Whatever reliance Eastern placed in that letter was clearly unreasonable, especially at the time of the Option date, when, by its very own testimony it believed it was in arrears according to UDC's records, in the amount of at least $9,662. Any injury resulting to Eastern due to UDC's rejection of the exercise of the Options, therefore, is clearly not attributable to a misrepresentation by UDC nor by a "reasonable" reliance thereon. Rather, Eastern's loss of the Options was due solely to its own failure to pay its arrearages in compliance with the terms of the Option Agreements.

#### E.

Eastern argues that notice was required under the Leases before it could be in default. It is clear that notice here was more than adequate.

The Option Agreements were specifically conditioned upon Eastern not being in default when it exercised the Options. Plaintiff's Trial Exhibit 2, ¶ 2. "Default" under the Leases is addressed in Article 17 thereof. Subsection (2) of that provision pertains to default in rental payments. It provides that if the Tenant is in default of rental payments "for more than five (5) days after notice of such default" then the Landlord without notice could take action to dispossess the Tenant. *Id.*

Here, Eastern was notified on a monthly basis in its billing stubs which set forth the amount it was in arrears. This was writ-

ten notice, in compliance with the terms of the Lease. *Birnbaum Estate v. Yankee Whaler Inc.*, 75 A.D.2d 708, 427 N.Y.S.2d 129, *aff'd* 51 N.Y.2d 935, 434 N.Y.S.2d 994, 415 N.E.2d 982 (4th Dept.1980). Eastern received notice as of November 28, 1981, by way of an invoice from UDC stating "your account is in arrears of $9,300.61 as of 10/30/81." Defendants' Trial Exhibit UU. On December 23, 1981, eight days before the expiration of the Option Date, Eastern received another invoice from UDC indicating that it was in arrears in amount of $12,133.44 as of November 30, 1981. Defendant's Trial Exhibit UU; Transcript 427. Despite this notice of arrearages, a clear default under the Lease, Eastern still attempted to exercise the Options on December 31, 1981, a point of time at which Eastern, by its own admissions acknowledged that it was on notice of such a default in the amount of $9,662.66, Transcript 429–30. Hence, not only was Eastern adequately notified of its arrears, but it chose to exercise the Options with disregard to that default. The problem, therefore, was not one of notice, but rather, Eastern's wilfull disregard of that notice and forfeiture of its right to purchase the Premises pursuant to the express terms of the Option Agreements.

### F.

Lastly, Eastern appeals to this court on equitable grounds, asserting that the sale of the Premises pursuant to its exercise of the Options must be specifically enforced in order to prevent a forfeiture. Eastern Systems, Inc.'s Post–Trial Findings of Fact and Conclusions of Law 56–59. While it is true that equity will intervene in order to prevent a substantial forfeiture of a lease due to a trivial or technical breach, *see J.N.A. Realty Corp. v. Cross Bay Chelsea Inc.*, 42 N.Y.2d 392, 397–98, 397 N.Y. S.2d 958, 960–61, 366 N.E.2d 1313, 1316 (Ct.App.1977), or to relieve a party from the consequences of a good faith mistake, promptly cured and with no prejudice to the other party, *see Graf v. Hope Bldg.*

*Corp.*, 254 N.Y. 1, 13, 171 N.E. 884, 886 (1930) (Cardozo, C.J., dissenting), equity will not intervene where the forfeiture results from a party's failure to comply with a material term of an agreement, such as the payment of rent under a commercial lease. *See Fifty States Management v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573 at 578, 415 N.Y.S.2d 800, 389 N.E.2d 113. Since a covenant to pay rent is an essential part of the parties' bargained for agreement under a lease,

> [a]bsent some element of fraud, exploitive overreaching or unconscionable conduct on on the part of the landlord to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties.

*Fifty States Management*, 46 N.Y.2d at 578, 415 N.Y.S.2d 800, 389 N.E.2d 113.

There has been no evidence whatsoever of any fraud,[5] overreaching or exploitive conduct by UDC. Rather, the record demonstrates a persistent and wilfull conduct by Eastern in failing to pay rent, a breach of a substantial obligation under the lease. Hence, Eastern cannot claim that this was an isolated incident of non-payment. *See, e.g., National Shoes v. Annex Camera Electronics*, 452 N.Y.S.2d 537.

Eastern's right to purchase the Premises under the Options was expressly conditioned upon its being in compliance with the terms of the Leases. The refusal by UDC to accept Eastern's Options results not in a forfeiture to Eastern "but only in the loss of the privilege [to purchase] because the conditions precedent to enjoyment of the privilege have not been met." *Jefpaul Garage*, 61 N.Y.2d at 461, 474 N.Y.S.2d 458, 462 N.E.2d 1176.

For the reasons set forth above, we find that Defendants' rejection of the Plaintiff's exercise of the Options was proper and that such rejection did not constitute a breach

---

**5.** Although Eastern set forth a Fifth Cause of Action for Fraud in its Complaint, Complaint ¶ 45, it has failed to proffer any evidence of that allegation in its Findings of Fact and Conclusions of Law.

of its agreements with Eastern.[6] Thus, Eastern's demand for specific performance of the sale of the Premises under the Options must be denied.

As of the date of this Order, Eastern continues to occupy the Premises without the express or implied consent of the Defendants, notwithstanding the expiration of the Leases on December 31, 1987.[7] Accordingly, Defendants' request for possession of the Premises must be granted.

The foregoing constitutes the Court's findings of fact and conclusions of law subsequent to Rule 7052 of the Rules of Bankruptcy Procedure. Judgment is to be entered for Defendants consistent with this Decision.

IT IS SO ORDERED.

---

**6.** As to Eastern's sixth cause of action as set forth in its Complaint, alleging that the Defendants' conduct constituted a deceptive practice under N.Y.GEN.BUS.LAW § 349 (McKinney 1988), we find that there is no evidence whatsoever in the record to substantiate that allegation, and, accordingly deny their request for

attorneys fees under Section 349(h) of that statute.

**7.** The parties have stipulated that the amount due for rent as of December 31, 1987 is $130,-724.78. Defendants are to be allowed a claim in that amount. *See* Transcript 460.